# IN THE
# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

CITY OF CHICAGO,

Plaintiff-Appellee,

v.

JEFFERSON B. SESSIONS, III,
Attorney General of the United States,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 17-cv-05720
The Honorable Harry D. Leinenweber, Judge Presiding

—————

## BRIEF FOR PLAINTIFF-APPELLEE

—————

JAMIE S. GORELICK
DAVID W. OGDEN
ARI HOLTZBLATT
ARI SAVITZKY
MOLLY M. JENNINGS
TIFFANY WRIGHT
BRIDGET FAHEY*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

DEBO P. ADEGBILE
ADRIEL I. CEPEDA DERIEUX
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*Admitted to practice only in Colorado. Supervised by members of the firm who are members of the District of Columbia Bar.*

EDWARD N. SISKEL
Corporation Counsel of the City of Chicago
BENNA RUTH SOLOMON
Deputy Corporation Counsel
MYRIAM ZRECNY KASPER
ANDREW W. WORSECK
Chief Assistant Corporation Counsel
JUSTIN A. HOUPPERT
SCOTT D. SPEARS
Assistant Corporation Counsel
30 N. LaSalle Street, Suite 800
Chicago, IL 60602
(312) 744-7764

RONALD S. SAFER
MATTHEW C. CROWL
NICK KAHLON
LAURA KLEINMAN
TAL CHAIKEN
RILEY SAFER HOLMES & CANCILA LLP
Three First National Plaza
70 West Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700

# CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: __17-2991__

Short Caption: __City of Chicago v. Sessions__

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

   [  ]   PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   The City of Chicago

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Wilmer Cutler Pickering Hale and Dorr; Riley Safer

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      N/A

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature:  __/s Jamie Gorelick__          Date:  __12/28/2017__

Attorney's Printed Name:  __Jamie Gorelick__

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).     Yes _____     No _____X

Address:  __1875 Pennsylvania Ave NW, Washington, DC 20006__

Phone Number:  __202-663-6500__          Fax Number:  __202-663-6363__

E-Mail Address:  __jamie.gorelick@wilmerhale.com__

rev. 01/08 AK

## CIRCUIT RULE 26.1  DISCLOSURE STATEMENT

Appellate Court No:  17-2991

Short Caption:  City of Chicago v. Sessions

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

   [  ]   PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   The City of Chicago

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Wilmer Cutler Pickering Hale and Dorr; Riley Safer

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      N/A

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature:  /s David W. Ogden                                          Date:  12/28/2017

Attorney's Printed Name:  David W. Ogden

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).   Yes _____   No _____X

Address:   1875 Pennsylvania Ave NW, Washington, DC 20006

Phone Number:  202-663-6440                          Fax Number:  202-663-6363

E-Mail Address:  david.ogden@wilmerhale.com

rev. 01/08 AK

# CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: <u>17-2991</u>

Short Caption: <u>City of Chicago v. Sessions</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

[    ]   PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    The City of Chicago

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Wilmer Cutler Pickering Hale and Dorr; Riley Safer

(3)   If the party or amicus is a corporation:

    i)   Identify all its parent corporations, if any; and

        N/A

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

        N/A

Attorney's Signature:  <u>/s Ari Holtzblatt</u>        Date:  <u>12/28/2017</u>

Attorney's Printed Name:  <u>Ari Holtzblatt</u>

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).     Yes _____     No _____X

Address:   <u>1875 Pennsylvania Ave NW, Washington, DC 20006</u>

Phone Number:  <u>202-663-6964</u>      Fax Number:  <u>202-663-6363</u>

E-Mail Address:  <u>ari.holtzblatt@wilmerhale.com</u>

rev. 01/08 AK

# CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No:  17-2991

Short Caption:  City of Chicago v. Sessions

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

   [  ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED
            AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   The City of Chicago

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Wilmer Cutler Pickering Hale and Dorr; Riley Safer

(3)   If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

         N/A

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

         N/A

Attorney's Signature:  /s Ari J. Savitzky                            Date:  12/28/2017

Attorney's Printed Name:  Ari J. Savitzky

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).   Yes _____   No _____X

Address:   1875 Pennsylvania Ave NW, Washington, DC 20006

Phone Number:  202-663-6232                    Fax Number:  202-663-6363

E-Mail Address:  ari.savitzky@wilmerhale.com

rev. 01/08 AK

CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: _17-2991_

Short Caption: _City of Chicago v. Sessions_

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

    [   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    The City of Chicago

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Wilmer Cutler Pickering Hale and Dorr; Riley Safer

(3)   If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

        N/A

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

        N/A

Attorney's Signature:  _/s Molly Jennings_        Date:  _12/28/2017_

Attorney's Printed Name:  _Molly Jennings_

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).   Yes _____   No _____X_

Address:  _1875 Pennsylvania Ave NW, Washington, DC 20006_

Phone Number:  _202-663-6947_       Fax Number:  _202-663-6363_

E-Mail Address:  _molly.jennings@wilmerhale.com_

# CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: 17-2991

Short Caption: City of Chicago v. Sessions

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

[ ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH   INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

The City of Chicago

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Wilmer Cutler Pickering Hale and Dorr; Riley Safer

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature:  /s/ Tiffany R. Wright                    Date:  12/28/2017

Attorney's Printed Name:  Tiffany R. Wright

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).   Yes _____   No x _____

Address:  1875 Pennsylvania Ave NW, Washington, DC 20006

Phone Number:  202-663-6148                    Fax Number:  202-663-6363

E-Mail Address:  tiffany.wright@wilmerhale.com

rev. 01/08 AK

CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: _17-2991_

Short Caption: _City of Chicago v. Sessions_

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

    [  ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED
             AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

       The City of Chicago

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

       Wilmer Cutler Pickering Hale and Dorr; Riley Safer

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

            N/A

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

            N/A

Attorney's Signature:  _/s Bridget Fahey_                          Date:  _12/28/2017_

Attorney's Printed Name:  _Bridget Fahey_

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).   Yes _____   No _____X

Address:  _1875 Pennsylvania Ave NW, Washington, DC 20006_

Phone Number:  _202-663-6746_                  Fax Number:  _202-663-6363_

E-Mail Address:  _bridget.fahey@wilmerhale.com_

rev. 01/08 AK

Appellate Court No: 17-2991

Short Caption: City of Chicago v. Sessions

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

**[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

The City of Chicago

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Wilmer Cutler Pickering Hale and Dorr; Riley Safer

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: /s/ Debo P. Adegbile                    Date: 12/28/2017

Attorney's Printed Name: Debo P. Adegbile

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).    Yes _____   No x _____

Address: 7 World Trade Center, 250 Greenwich Street, New York, NY 10007

Phone Number: 212-295-6717                    Fax Number: 212-230-8888

E-Mail Address: debo.adegbile@wilmerhale.com

rev. 01/08 AK

CIRCUIT  RULE  26.1   DISCLOSURE  STATEMENT

Appellate Court No: __17-2991_____

Short Caption: __City of Chicago v. Sessions_____

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

    [  ]     PLEASE CHECK  HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED
             AND INDICATE  WHICH   INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    The City of Chicago
    _____
    _____

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Wilmer Cutler Pickering Hale and Dorr; Riley Safer
    _____
    _____

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

    _____

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

    _____

Attorney's Signature: __/s/ Adriel I. Cepeda Derieux_____     Date: __12/28/2017_____

Attorney's Printed Name: __Adriel I. Cepeda Derieux_____

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).    Yes _____   No _x_____

Address: __7 World Trade Center, 250 Greenwich Street, New York, NY 10007_____
         _____

Phone Number: __212-295-6303_____     Fax Number: __212-230-8888_____

E-Mail Address: __adriel.cepedaderieux@wilmerhale.com_____

rev. 01/08 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 17-2991

Short Caption: The City of Chicago v. Jefferson B. Sessions III

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[   ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   The City of Chicago

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Riley Safer Holmes & Cancila LLP; Wilmer Cutler Pickering Hale and Dorr LLP

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

   None

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

   None

Attorney's Signature:  s/  Ronald S. Safer          Date: 12/27/2017

Attorney's Printed Name:  Ronald S. Safer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address:   Three First National Plaza, 70 West Madison Street, Suite 2900, Chicago, Illinois 60602

Phone Number: 312-471-8736          Fax Number:  312-471-8701

E-Mail Address:  rsafer@rshc-law.com

rev. 01/15 GA

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 17-2991

Short Caption: The City of Chicago v. Jefferson B. Sessions III

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]       PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

The City of Chicago

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Riley Safer Holmes & Cancila LLP; Wilmer Cutler Pickering Hale and Dorr LLP

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

None

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

None

Attorney's Signature:  s/  Matthew C. Crowl                    Date: 12/27/2017

Attorney's Printed Name:  Matthew C. Crowl

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address:  Three First National Plaza, 70 West Madison Street, Suite 2900, Chicago, Illinois 60602

Phone Number:  312-471-8720                Fax Number:  312-471-8701

E-Mail Address:  mcrowl@rshc-law.com

rev. 01/15 GA

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 17-2991

Short Caption: The City of Chicago v. Jefferson B. Sessions III

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

The City of Chicago

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Riley Safer Holmes & Cancila LLP; Wilmer Cutler Pickering Hale and Dorr LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

None

Attorney's Signature:  s/ Nick Kahlon                    Date: 12/27/2017

Attorney's Printed Name:  Nick Kahlon

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____   **No** ✗

Address:  Three First National Plaza, 70 West Madison Street, Suite 2900, Chicago, Illinois 60602

Phone Number: 312-471-8755                    Fax Number: 312-471-8701

E-Mail Address:  nkahlon@rshc-law.com

rev. 01/15 GA

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 17-2991

Short Caption: The City of Chicago v. Jefferson B. Sessions III

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

The City of Chicago

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Riley Safer Holmes & Cancila LLP; Wilmer Cutler Pickering Hale and Dorr LLP

(3)   If the party or amicus is a corporation:

i)   Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

None

Attorney's Signature: s/ Laura Kleinman                    Date: 12/27/2017

Attorney's Printed Name: Laura Kleinman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address: Three First National Plaza, 70 West Madison Street, Suite 2900, Chicago, Illinois 60602

Phone Number: 312-471-8685                    Fax Number: 312-471-8701

E-Mail Address: lkleinman@rshc-law.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 17-2991

Short Caption: The City of Chicago v. Jefferson B. Sessions III

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

The City of Chicago

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Riley Safer Holmes & Cancila LLP; Wilmer Cutler Pickering Hale and Dorr LLP

(3)   If the party or amicus is a corporation:

i)   Identify all its parent corporations, if any; and

None

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

None

Attorney's Signature: s/ Tal C. Chaiken          Date: 12/27/2017

Attorney's Printed Name: Tal C. Chaiken

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ___✕___

Address: Three First National Plaza, 70 West Madison Street, Suite 2900, Chicago, Illinois 60602

Phone Number: 312-471-8725          Fax Number: 312-471-8701

E-Mail Address: tchaiken@rshc-law.com

rev. 01/15 GA

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENTS

TABLE OF AUTHORITIES ........................................................................iii

JURISDICTIONAL STATEMENT .................................................................. 1

ISSUES PRESENTED ........................................................................... 1

STATEMENT OF THE CASE ...................................................................... 1

    A.     Chicago's Welcoming City Ordinance ........................................ 1

    B.     The Byrne JAG Program.................................................... 4

    C.     The Attorney General's New Byrne JAG Policy............................... 7

    D.     District Court Proceedings................................................ 9

SUMMARY OF ARGUMENT ...................................................................... 14

ARGUMENT .................................................................................. 16

I.     THE ATTORNEY GENERAL'S NOTICE AND ACCESS
      POLICY IS *ULTRA VIRES*.................................................... 18

    A.     The Byrne JAG Statute Does Not Authorize The Notice
         And Access Policy ....................................................... 19

    B.     34 U.S.C. § 10102 Does Not Authorize The Notice And
         Access Policy ........................................................... 24

         1.     The text of section 10102(a)(6) precludes the
             Attorney General's reading............................................ 24

         2.     Statutory context confirms that the Attorney
             General's reliance on section 10102(a)(6) is
             misplaced............................................................. 29

C. Neither The Attorney General's Policy Priorities, Nor The Structure Of Immigration Law, Authorizes The Notice And Access Policy .......................................................................... 34

II. THE DISTRICT COURT PROPERLY ENJOINED THE ATTORNEY GENERAL'S UNLAWFUL NOTICE AND ACCESS POLICY ACROSS-THE-BOARD ....................................................... 39

A. Chicago Has Standing To Seek An Injunction That Benefits Other Jurisdictions Harmed By The Same Unlawful And Unconstitutional Policy That Harms Chicago ....................................................................... 40

B. The District Court Acted Within Its Discretion In Enjoining The New Conditions ................................................... 47

CONCLUSION ........................................................................................... 53

STATUTORY ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page

*Alvarez v. Smith*, 558 U.S. 87 (2009) .................................................................... 45

*Amalgamated Transit Union v. Skinner*, 894 F.2d 1362 (D.C. Cir. 1990) ........................... 35

*Bailey v. Patterson*, 323 F.2d 201 (5th Cir. 1963) .................................................... 50

*Bank of United States v. Deveaux*, 9 U.S. (5 Cranch) 61 (1809)......................................... 44

*Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987)........................................................ 50

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........................................................ 44

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ...................................................... 40, 49

*Central United Life Insurance Co. v. Burwell*, 827 F.3d 70 (D.C. Cir. 2016) ........................ 18

*Chickasaw Nation v. United States*, 534 U.S. 84 (2001) ........................................................ 25

*City of Arlington v. FCC*, 133 S. Ct. 1863 (2013)................................................. 18

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ................................................... 45

*City of Los Angeles v. McLaughlin*, 865 F.2d 1084 (9th Cir. 1989)................................ 4, 19

*City of Philadelphia v. Sessions*, No. CV 17-3894, 2017 WL 5489476
    (E.D. Pa. Nov. 15, 2017)......................................................................19, 28, 36

*County of Santa Clara v. Trump*, Nos. 17-cv-00485 & 17-cv-00574,
    2017 WL 5569835 (N.D. Cal. Nov. 20, 2017)...................................................... 7

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ...............................................40, 44, 45

*Dayton Board of Education v. Brinkman*, 433 U.S. 406 (1977)........................................... 48

*Decker v. O'Donnell*, 661 F.2d 598 (7th Cir. 1980)........................................................43, 48

*Epsilon Electronics, Inc. v. U.S. Department of Treasury, Office of Foreign Assets Control*, 857 F.3d 913 (D.C. Cir. 2017)................................................................... 25

*Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011) ................................................................... 42

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000) ................................................................. 45

*Gaffney v. Riverboat Services of Indiana, Inc.*, 451 F.3d 424 (7th Cir. 2006) .................... 25, 30

*Gautreaux v. Chicago Housing Authority*, 690 F.2d 601 (7th Cir. 1982) .............................. 47

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ........................................................ 18, 27

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ........................................................ 18, 38

*H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827 (7th Cir. 2012) ................................................................. 48

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) ............................................ 43

*Harris County, Texas v. Gist*, 976 F. Supp. 601 (S.D. Tex. 1996) ....................................... 6

*Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017) .................................................... 51

*Hibbs v. Winn*, 542 U.S. 88 (2004) ............................................................... 44

*Horina v. City of Granite City, Illinois*, 538 F.3d 624 (7th Cir. 2008) ................................ 42

*In re Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016) .................................... 51

*International Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017) ................. 51

*Jama v. ICE*, 543 U.S. 335 (2005) .............................................................. 20

*Koo v. McBride*, 124 F.3d 869 (7th Cir. 1997) .............................................. 13, 40

*Laskowski v. Spellings*, 546 F.3d 822 (7th Cir. 2008) ........................................... 45

*Lineback v. Spurlino Materials, LLC*, 546 F.3d 491 (7th Cir. 2008) ................................. 40

*Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644 (9th Cir. 2011) ........................ 50

*Louisiana Public Service Commission v. FCC*, 476 U.S. 355 (1986) .............................. 18, 35

*Marquette Cement Manufacturing Co. v. FTC*, 147 F.2d 589 (7th Cir. 1945) ....................... 35

*McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949) ......................................... 49

*McKenzie v. City of Chicago*, 118 F.3d 552 (7th Cir. 1997) ...................................... 46

*Missouri v. Jenkins*, 515 U.S. 70 (1995) .............................................................. 40

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) .................................. 45

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) .................................. 32

*National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007).................... 32

*NLRB v. Express Publishing Co.*, 312 U.S. 426 (1941) ........................................ 40

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).................................................... 42

*Owner-Operator Independent Drivers Ass'n v. Federal Motor Carrier Safety Administration*, 656 F.3d 580 (7th Cir. 2011) ......................................... 43

*P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69 (1979) .................................................... 26

*Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981) .......................27, 35, 39

*Preston v. Thompson*, 589 F.2d 300 (7th Cir. 1978) ............................................ 47

*Printz v. United States*, 521 U.S. 898 (1997) ...................................................... 37

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) ..................... 32

*Russello v. United States*, 464 U.S. 16 (1983).................................................... 20

*Russian Media Group, LLC v. Cable America, Inc.*, 598 F.3d 302 (7th Cir. 2010) ..............................................................16, 48, 49

*Scherr v. Marriott International, Inc.*, 703 F.3d 1069 (7th Cir. 2013)............................ 46, 47

*Solid Waste Agency v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ........................ 18

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) .................................................. 41

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) ........................ 43

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) .................................. 40, 45

*Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971) .................. 47

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015)............................................ 43

*Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080 (2017) ............................ 43

*Trump v. International Refugee Assistance Project*, 138 S. Ct. 353 (2017) (mem.).................. 51

*Virginia Society for Human Life, Inc. v. FEC*, 263 F.3d 379 (4th Cir. 2001)....................... 50

*Wabash Valley Power Ass'n v. Rural Electrification Administration*, 988 F.2d 1480 (7th Cir. 1993) ........................................................................... 35

*Warth v. Seldin*, 422 U.S. 490 (1975) .......................................................... 45

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ...................................... 50, 51

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001) ............................... 27

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ............................ 42

*Wisconsin v. Constantineau*, 400 U.S. 433 (1971) ....................................... 42

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ............................ 42

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const.
  art. III, § 1 ...................................................................... 40
  art. III, § 2 ...................................................................... 40

5 U.S.C. § 706 .................................................................... 42

8 U.S.C.
  § 1226 ........................................................................ 37
  § 1231 ........................................................................ 37
  § 1357 ........................................................................ 38
  § 1373 ........................................................................ 9, 29

25 U.S.C. § 1652 ................................................................. 20

34 U.S.C.
    § 10102 .......................................................................................*passim*
    § 10142 ................................................................................................ 32
    § 10152 ............................................................... 4, 5, 6, 21, 30
    § 10153 .................................................................................5, 6, 30
    § 10156 ............................................................................................ 4, 21
    § 10157 .........................................................................5, 22, 30, 31
    §§ 10332-10334.......................................................................... 31
    § 10446 ................................................................................................ 34
    §§ 10591-10593.......................................................................... 31
    § 10631 ................................................................................................ 32
    § 20927 ................................................................................................ 22
    § 30307 ................................................................................................ 22
    § 60105 ................................................................................................ 22

42 U.S.C.
    § 1769e ............................................................................................... 20
    § 3796gg-1 ........................................................................................ 20
    § 10305 ............................................................................................... 20

## REGULATIONS AND RULES

Uniform Administrative Requirements, Cost Principles, and Audit
    Requirements for Federal Awards, 2 C.F.R. § 200.205 ........................ 28

28 C.F.R. § 66.12 ........................................................................................ 28

Fed. R. Civ. P.
    Rule 23, Advisory Committee Notes................................................. 50
    Rule 26................................................................................................... 50
    Rule 65............................................................................................40, 50
    Rule 71................................................................................................... 50

## LEGISLATIVE MATERIALS

Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2(b)(2) (2015) .................................. 23

Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong.
    (2015) ................................................................................................................... 23

H.R. Rep. No. 109-233 (2005) ..............................................................6, 15, 23

*Reauthorization of the United States Department of Justice: Criminal Law Enforcement: Hearing Before the Subcommittee on Crime, Terrorism, and Homeland Security of the House Committee on the Judiciary*, 108th Cong. (2003) ................................................................................................ 6

## OTHER AUTHORITIES

Allen, Kenneth J., *Federal Grant Practice* (2017) ............................................. 19, 28

*Black's Law Dictionary* (10th ed. 2014) .............................................................. 26

Federalist No. 51 (Madison) ................................................................................. 38

U.S. Department of Justice, Office of Justice Programs, *Awards Made for Solicitation: Edward Byrne Memorial Justice Assistance Grant (JAG) Program - Local Solicitation* (as of Dec. 27, 2017), *available at* goo.gl/df2Yab ...................................................................................................... 4

Wright, Charles Alan & Arthur R. Miller, *Federal Practice & Procedure* (3d ed. 2017) ...................................................................................................... 48

# JURISDICTIONAL STATEMENT

The jurisdictional statement of defendant-appellant Jefferson B. Sessions, III, is complete and correct.

# ISSUES PRESENTED

1.      Whether the Attorney General can impose grant conditions on the Byrne Justice Assistance Grant ("Byrne JAG") formula grant program that are not authorized by law and contradict the stated purposes of the grant program.

2.      Whether the district court exceeded its authority or abused its discretion in enjoining the Attorney General from applying to Byrne JAG recipients other than Chicago the unlawful and unconstitutional policy reflected in his grant conditions.

# STATEMENT OF THE CASE

## A.      Chicago's Welcoming City Ordinance

Since the 1980s, Chicago has refined a "Welcoming City" policy designed to build trust and cooperation between the Chicago Police Department and local immigrant communities.  At its core, the policy prioritizes local crime-fighting and public safety over the policing of federal civil immigration infractions.  R.219-228.[1]

In 2006, Chicago's City Council formalized the Welcoming City policy— previously prescribed through mayoral executive orders—by unanimously adopting the Welcoming City Ordinance ("WCO").  R.229-235.  In response to the federal

---

[1]      We cite the pages of the record on appeal as "R.__," the Attorney General's opening brief as "Sessions Br. __," the Attorney General's Short Appendix as "SA__," and the Attorney General's Appendix as "App.__."

Executive's increased pressure to assist in civil immigration enforcement, the WCO rejected spending "limited local resources on traditionally federal functions." R.231. City leaders believed that acceding to federal pressure to assist in immigration enforcement would "threat[en] immigrant and minority profiling and harassment" and thereby "chil[l]" effective local law enforcement as "fear of deportation" led "witnesses and victims" to avoid cooperation with police. R.232.

In 2012, Chicago further revised the WCO to "clarify the communications and enforcement relationship between the City and the federal government." R.239. These clarifications were necessary to achieve "[o]ne of the City's most important goals": "enhanc[ing] the City's relationship with the immigrant communities." *Id.* The 2012 WCO reaffirmed that removing barriers to "the cooperation of all persons, both documented citizens and those without documentation status," with law enforcement was "essential to prevent and solve crimes and maintain public order, safety, and security in the entire City." *Id.*

The current version of the WCO thus limits Chicago's participation in federal immigration enforcement, while providing exceptions for individuals who are wanted on a criminal warrant, have been convicted of a felony, are a defendant on a felony charge, or are a known gang member. R.244-245 (Municipal Code of Chicago, Ill. ("MCC") § 2-173-042). The WCO prohibits City officials from collecting, investigating, or disclosing an individual's citizenship or immigration status unless required to do so by court order or state or federal law, or unless disclosure has been

authorized in writing.  R.244 (MCC §§ 2-173-020, 2-173-030).  And, most relevant here, the ordinance bars City officials from spending time responding to Immigration and Customs Enforcement ("ICE") inquiries about the "custody status or release date" of a person detained by Chicago, "permit[ting] ICE agents access" to City detainees, or "permit[ting] ICE agents use of [City] facilities for investigative interviews," unless the detainee in question is a known gang member or is suspected of or has been convicted of a serious crime.  R.245 (MCC § 2-173-042(b)(1)).

The WCO reflects Chicago's deliberate choice to focus police resources on investigating serious crimes and promote police engagement with all its residents, including immigrant communities.  Under the WCO, police officers engage with federal immigration enforcement to fight serious crime, while also advancing Chicago's goal of fostering trust with all its residents.  R.202-203.  This policy is sound:  As one study of so-called "sanctuary" jurisdictions found, "crime is statistically significantly lower in sanctuary counties compared to nonsanctuary counties . . . controlling for population characteristics."  R.333.  A coalition of police chiefs has explained that their on-the-ground experience is consistent with that insight:  "[B]uild[ing] trusting and supportive relationships with immigrant communities," they said, "is essential to reducing crime and helping victims."  R.354-355.

### B.    The Byrne JAG Program

The Byrne JAG program "is the primary provider of federal criminal justice funding to States and units of local government."  App.5.  For Fiscal Year ("FY") 2016, Congress appropriated $476 million for the Byrne JAG program, R.953, and more than 1,000 grants were awarded to state and local governments for a wide range of purposes—from prosecution of drug offenses to purchase of body-worn cameras to enhancement of crime scene investigation tools.  Department of Justice, Office of Justice Programs, *Awards Made for Solicitation: Edward Byrne Memorial Justice Assistance Grant (JAG) Program - Local Solicitation* (as of Dec. 27, 2017), *available at* goo.gl/df2Yab.

Congress designed the Byrne JAG program to allow local flexibility and discretion.  The Byrne JAG program is a formula grant, under which the Attorney General "shall allocate" funds, 34 U.S.C. § 10156(d)(2)(A), "in accordance with" a formula based on population and crime statistics, *id.* § 10152(a)(1); *see* § 10156(d)(2)(A).  Formula grants "are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989).

Consistent with the nature of formula grants, the Byrne JAG statute circumscribes the Attorney General's process for distributing Byrne JAG funds, affording only narrow discretion over certain non-substantive aspects of the program. *First*, the Attorney General must follow the statutory formula to determine allotments for each state and local government.  34 U.S.C. § 10156.  As part of this process, the

Attorney General is authorized to "reserve not more than 5 percent" of the total funds allocated to the program for specific purposes after a finding that such reservation is "necessary" to address "extraordinary increases in crime" or to "mitigate significant programmatic harm" caused by the formula. *Id.* § 10157(b). There is no further authority in the statute to deviate from the formula. *Second*, the Attorney General invites jurisdictions to claim their allotments by submitting an application that includes several largely administrative components expressly outlined in the statute. *Id.* § 10153.

The Attorney General's authority to define or modify the components of the Byrne JAG application is similarly circumscribed. He may specify the "form" of the application. 34 U.S.C. § 10153(a). He may specify what "data, records, and information (programmatic and financial)" applicants can be "reasonably" required to provide to ensure programmatic and financial integrity. *Id.* § 10153(a)(4). He can "coordinat[e] with the National Institute of Justice" to develop a mandatory "program assessment component" to measure the success of funded programs. *Id.* § 10152(c). And he can require applicants to "comply with all provisions of this part and all other applicable Federal laws." *Id.* § 10153(a)(5)(D). There is no provision authorizing him to alter the application's components, or to add new requirements.

The statute requires only one substantive component for Byrne JAG applications: A plan indicating how the applicant will use its funds within one or more of eight broadly defined programmatic areas, 34 U.S.C. § 10153(a)(6), ranging

from "[l]aw enforcement" to "[d]rug treatment" to "crime victim" support, *id.* § 10152(a)(1)(A)-(H). An applicant is entitled to its Byrne JAG allotment as long as it uses funds to advance "any one" of those objectives. *Id.* §§ 10152(a)(1)-(2), 10153(a)(6)(B). The result is a grant program that guarantees law enforcement funding to state and local governments throughout the Nation, leaving to those governments the decision how best to spend the money.

The Byrne JAG program's deference to local law enforcement priorities and policies is no accident: It is the program's core objective. Congress created the current Byrne JAG program in 2005 by merging two funding programs for state and local criminal justice initiatives, the Local Law Enforcement Block Grant ("LLEBG") program and the Byrne Grant program. H.R. Rep. No. 109-233, at 88-89 (2005). These predecessor programs afforded state and local governments significant discretion over the use of federal funds. *E.g.*, *Harris Cnty, Texas v. Gist*, 976 F. Supp. 601, 605-606 (S.D. Tex. 1996) ("Under the [LLEBG] program, local governments receive federal funds to supplement their law enforcement budgets and have broad control over the decision how to use the funds.").

In combining these prior programs, Congress sought to give state and local governments even "more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89; *see also Reauthorization of the U.S. Dep't of Justice: Criminal Law Enforcement: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 108th

Cong. 68 (2003) (testimony of Deborah Daniels, Assistant Attorney General for the Office of Justice Programs) (expressing support for the new Byrne JAG program to "permit States and communities to improve all aspects of their criminal justice and correction systems" by giving them "more discretion").

Chicago has received Byrne JAG funds every year since the program's inception, including $33 million for the purchase of nearly 1,000 police cruisers and funds for the Police Department's Force for Good Program, which helps nonprofit organizations working to reduce violence in Chicago's most at-risk neighborhoods. R.206-207, R.413-414. Chicago's FY2017 application sought funds for several local policing priorities, including to expand Chicago's use of ShotSpotter technology to help officers pinpoint the location of shooting incidents faster and with more precision. R.934.

C.    The Attorney General's New Byrne JAG Policy

From the start, this Administration has singled out America's largest and most diverse cities because of policies, like Chicago's WCO, that aim to foster cooperation between police and immigrant communities. President Trump issued Executive Order 13768 during his first week in office, which threatened to deny federal money to and take enforcement action against an undefined group of so-called "sanctuary jurisdictions." That order was preliminarily enjoined in April, and has now been permanently enjoined, for violating numerous constitutional safeguards, including separation of powers. *County of Santa Clara v. Trump*, Nos. 17-cv-00574, 17-cv-00485,

2017 WL 5569835 (N.D. Cal. Nov. 20, 2017), *appeal filed*, No. 17-17480 (9th Cir. Dec. 14, 2017).[2]

The Administration next sought to repurpose the Byrne JAG program to do what it had been enjoined from doing by executive order. In August 2017, the Department of Justice ("DOJ") released the FY2017 Byrne JAG application. It contained two new conditions seeking to press local law enforcement officers into federal civil immigration enforcement efforts. App.30.

*First*, the new "notice" condition would require grant recipients to "provide at least 48 hours' advance notice to [the Department of Homeland Security ("DHS")] regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice to take custody of the alien pursuant to the Immigration and Nationality Act." App.30. Among other things, this condition would require grantees to hold any detainee subject to a notice request for at least 48

---

[2]    In July 2017, President Trump referred to immigrants as "predators and criminal aliens who poison our communities with drugs and prey on innocent young people," and avowed that those "animals" would "find no safe haven anywhere in our country." R.42. He promised a "nationwide crackdown on sanctuary cities." *Id.* Attorney General Sessions has likewise attacked "sanctuary jurisdictions"—even going so far as to allege that "sanctuary" jurisdictions "encourage . . . human trafficking" and "shelter and protect lethal gangs and transnational criminal organizations like Latin Kings and MS-13." R.42, R.874. And in a speech delivered after Chicago filed this lawsuit, the Attorney General mischaracterized Chicago's Welcoming City policy in particular—asserting that "if you enter the country . . . with a criminal record and get to Chicago, [Chicago] will not even support deporting you even after you commit a serious crime against one of our citizens." R.874. That is false: The WCO explicitly permits cooperation regarding serious crimes.

hours, even if the detainee would otherwise be released sooner. *Second*, the new "access" condition would require grant recipients to "permit [DHS personnel] to access any correctional or detention facility in order to meet with" and interrogate anyone suspected of being a non-citizen. *Id.*[3]

The new conditions conflict with the WCO's limitations on notifying ICE about the "custody status or release date" of detainees, on "permit[ing] ICE agents access" to City detainees, and on "permit[ing] ICE agents use of [City] facilities for investigative interviews." R.245 (MCC § 2-173-042(b)(1)). And, as written, the requirement to provide DHS "at least 48 hours' advance notice" was effectively impossible for Chicago, which exclusively operates temporary "lockup" facilities where arrestees are held only briefly before a probable cause hearing or other initial proceeding in the Circuit Court of Cook County. Chicago Police Department General Order G06-01 prohibits detaining most individuals for more than 48 hours. R.304-305. And Chicago holds the vast majority of individuals fewer than 24 hours—and often significantly fewer, such as when an arrestee is released on his own recognizance or charges are not filed. R.51.

## D.    District Court Proceedings

On August 7, less than a week after the release of the FY2017 Byrne JAG application, Chicago filed suit challenging the Attorney General's new notice and

---

[3]    The Attorney General has also sought to impose a third condition, which relates to compliance with 8 U.S.C. § 1373. The district court did not enjoin that condition, and it is not a part of this appeal.

access policy, and within days moved for a preliminary injunction to maintain the status quo and prevent the Attorney General from imposing the conditions on FY2017 Byrne JAG funds. R.31, R.161. Chicago argued that the policy was unlawful because no provision of the Byrne JAG statute or any other statute granted the Attorney General authority to impose substantive policy conditions on Byrne JAG funds, and because such open-ended conditioning authority would conflict with numerous express constraints in the Byrne JAG statute. R.184-187. Chicago further argued that by impermissibly exercising Spending Clause powers assigned to Congress, the Attorney General's policy violated separation of powers principles and so was unconstitutional. R.191-192.

Chicago's motion for preliminary injunction, filed on August 10, sought to enjoin the Attorney General from applying the new policy to any applicant because the Byrne JAG program is a formula grant program that Congress intended to be administered uniformly. R.851. Furthermore, the legal issue is identical for all Byrne JAG applicants—the Attorney General's new conditions are no more lawful for other jurisdictions than they are for Chicago.

In opposing the preliminary injunction, the Attorney General pointed to no provision in the Byrne JAG statute authorizing the new notice and access policy.[4] Rather, he argued that he was authorized to override the Byrne JAG statute's mandatory formula based on a single clause in a separate statute describing the role of one Assistant Attorney General. That provision, 34 U.S.C. § 10102(a)(6), follows a list of specific duties and responsibilities, which range from maintaining liaison with other officials to coordinating the offices that report to the Assistant Attorney General, and provides that he may:

> exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants.

On September 15, a week after hearing argument, the district court issued an opinion and order enjoining the notice and access policy. The court observed that the Attorney General "fail[ed] to direct the Court to any textual authority within the Byrne JAG statute itself" to impose the conditions. SA13. And the district court rejected the notion that 34 U.S.C. § 10102(a)(6) granted such authority. The court

___

[4]     In connection with this filing, the Attorney General also rewrote the notice condition, which had required grantees to "provide at least 48 hours' advance notice" regarding the scheduled release of an alien. As revised, the notice condition required notice "as early as practicable (at least 48 hours, if possible)" and stated that no grantee would be required to "maintain (or detain) any individual in custody beyond the date and time the individual would have been released" absent the condition. App.62. As Chicago explained in its motion for preliminary injunction, the original requirement to "provide at least 48 hours' advance notice" violated the Fourth Amendment and was impossible to implement for temporary lock-up facilities, like those that Chicago operates. R.182, R.188-199.

first expressed doubt that the provision applied to the Byrne JAG program at all, since it appears in a separate provision of chapter 101. SA18-19. Assuming that it did apply, the court emphasized the limiting effect of the first half of the provision, which authorizes "such other powers as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General" and then illustrates those powers with the references to "placing special conditions" and "determining priority purposes." SA18. The court concluded that any power to "place special conditions on grants must flow either from the statute itself or from a delegation of power independently possessed by the Attorney General." *Id.* And because the Attorney General pointed to no such source of statutory authority, the court concluded that the conditions "exceed statutory authority, and, consequently, the efforts to impose them violate the separation of powers doctrine and are *ultra vires*." SA19.

The district court additionally found that the conditions—which, if acceded to, would cause "the collapse of trust between local law enforcement and immigrant communities that is essential to ferreting out crime," SA35-36—irreparably harmed Chicago. By contrast, the court perceived a "lack of injury afflicting the Attorney General" from an injunction that would restore the status quo. SA38-39. The court accordingly enjoined the "imposition of the notice and access conditions on the . . . JAG grant," for all grant recipients across the country, SA40-41, rather than for Chicago alone, because there was "no reason to think that the legal issues present in

this case are restricted to Chicago or that the statutory authority given to the Attorney General would differ in another jurisdiction," SA41.

The Attorney General filed a notice of appeal accompanied by a motion to stay the order's nationwide effect.  R.20, R.1071.  That motion argued for the first time that the injunction violated Article III because Chicago supposedly lacked standing to obtain relief that also benefits others.  R.1075-1078.

The district court denied the motion for a stay pending appeal, affirming Chicago's standing to seek a nationwide injunction based on the bedrock principle that "[o]nce a constitutional violation has been shown, 'the nature of the remedy must be determined by the nature and scope of the constitutional violation,'" even if that remedy benefits those not before the court.  App.103 (quoting *Koo v. McBride*, 124 F.3d 869, 873 (7th Cir. 1997)).  The Constitution, the court noted, "vests a district court with 'the judicial Power of the United States'" and "[t]his power is not limited to the jurisdiction in which the district court sits."  App.104.  The court further noted that this was an appropriate use of its discretion because "the Attorney General's authority, or lack thereof, [to impose the notice and access conditions] will not vary by

jurisdiction." *Id.* The Attorney General sought the same relief from this court, which likewise declined to stay the preliminary injunction. 7th Cir. Dkt. 33.[5]

## SUMMARY OF ARGUMENT

This case involves two programs critical to public safety in the City of Chicago: Chicago's decades-old Welcoming City policy, designed to build trust and cooperation between the police and local immigrant communities, so that Chicago can more effectively fight crime; and the federal Byrne JAG formula grant program, which has long provided much-needed federal funds to local law enforcement in Chicago, as well as more than a thousand other local governments and virtually every State in the Nation. The district court properly entered a preliminary injunction to bar the Attorney General's new notice and access policy, which exceeds statutory limits on congressionally allocated funds for state and local governments across the country.

The Attorney General lacks authority to impose the notice and access conditions on Byrne JAG recipients. Those conditions are nowhere authorized by the Byrne JAG statute, which grants the Attorney General only narrowly circumscribed authority over the distribution of Byrne JAG funds. The minimal role for executive discretion in the Byrne JAG program is by design: The program's objective is to "give State and local governments more flexibility to spend [federal] money for

---

[5] While the motion to stay was pending in the district court, the U.S. Conference of Mayors ("USCM"), representing the interests of 1,400 cities nationwide, including numerous Byrne JAG grant applicants, moved to intervene. R.1089. The district court denied that motion, in part because "[t]he nationwide injunction currently in force is sufficient to protect the interests of [USCM's] members." R.1583.

programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89.

Rather than attempt to locate authority in the Byrne JAG statute for imposing his own federal policy, the Attorney General points to an obscure provision specifying the duties of the Assistant Attorney General for the Office of Justice Programs ("OJP"), 34 U.S.C. § 10102. That provision does not confer the unfettered power the Attorney General claims. Read in context, section 10102 merely authorizes the Attorney General to assign his own powers to the Assistant Attorney General, and does not create new authority.

The Attorney General finally suggests that the "structure" and "implicit premise[s]" of the Immigration and Nationality Act ("INA") grant him the power to require state and local governments to participate in federal immigration enforcement. That is wrong. The INA does not empower the Attorney General to *require* enforcement of federal law—either directly or as a condition of receiving Byrne JAG funding.

The district court also properly enjoined the Attorney General's unlawful notice and access policy with respect to all jurisdictions seeking FY2017 JAG funds. Chicago's request for a nationwide injunction fell within the court's jurisdiction because Chicago satisfied Article III's standing requirement for each claim and for each form of relief it sought. That is all Article III requires; once the standing threshold has been crossed, Article III imposes no additional constraint on the scope

of the injunction a court may order. Decades of Seventh Circuit and Supreme Court precedent confirm this point.

Nor did the district court abuse its discretion by enjoining the notice and access policy in all applications. The Attorney General faces a heavy burden in attempting to overturn the injunction on this basis—"the appropriate scope of the injunction is left to the district court's sound discretion." *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 307 (7th Cir. 2010). And none of his arguments justifies disturbing the well-reasoned decision of the district court, because none forecloses a district court from issuing a nationwide injunction where the plaintiff seeks to facially invalidate a uniform federal policy.

## ARGUMENT

Chicago filed this lawsuit after the Attorney General announced a national policy of imposing two new conditions on the Byrne JAG program. Congress created the Byrne JAG program to support local priorities, but the Attorney General's new conditions seek to override Chicago's judgment about the importance of its Welcoming City policy, and to conscript Chicago police officers into federal immigration enforcement efforts. The district court properly enjoined the Attorney General's new policy because it is *ultra vires* and violates separation of powers. No law empowers the Attorney General to impose these intrusive conditions, and indeed, the new conditions contravene Congress's express directive that Byrne JAG funds must

be distributed based on a single formula using population and crime statistics, and that local governments would set their policy priorities for these funds.

That the Attorney General lacks any authorization for his conditions should end the matter. The Attorney General nevertheless argues that the injunction should be limited to Chicago, so that he can impose these unlawful conditions on hundreds of other governments across the Nation. This refusal to retreat from a policy after it has been ruled unlawful is inconsistent with the rule of law in a democratic society. Moreover, the Attorney General's primary argument—that the district court lacked jurisdiction to enjoin a nationwide policy on a nationwide basis—is meritless. The Attorney General is the defendant in this case; he adopted a single, unlawful policy, which Chicago successfully challenged. The district court plainly had the power to enjoin that policy; that other governments will also benefit from the injunction is irrelevant.

The Attorney General's further insistence that the district court abused its discretion in protecting the integrity of a nationally administered formula grant program through a nationwide injunction also fails. This was an appropriate provisional remedy to fit the case, the parties, and the threatened harms. This court should not countenance the notion that the Attorney General can impose an unlawful and unconstitutional policy on governments that have not also filed suit, and should affirm the injunction as entered.

# I.    THE ATTORNEY GENERAL'S NOTICE AND ACCESS POLICY IS *ULTRA VIRES*.

The Attorney General makes no claim in this case to be exercising inherent executive authority. Where that does not exist, a federal agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also Central United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016) ("agencies may act only when and how Congress lets them"). Consistent with basic separation of powers principles, agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is *ultra vires*." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013). And when a policy would "upset the usual constitutional balance of federal and state powers," Congress must make its intention to authorize the policy "'unmistakably clear in the language of the statute.'" *Gregory v. Ashcroft*, 501 U.S. 452, 452 (1991). This need for clear authority is most essential where federal policy threatens to interfere with "the States' police power," *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006), and where, as here, "an administrative interpretation" purports to "alte[r] the federal-state framework," *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-173 (2001).

The Attorney General's notice and access policy implicates all these principles. Yet here, nothing in the Byrne JAG statute (or any other statute) gives the Attorney General authority to impose these conditions on grant applicants (and override local

policy choices in the process). Because Congress did not authorize the notice and access policy, it is unlawful.

**A.    The Byrne JAG Statute Does Not Authorize The Notice And Access Policy.**

The Attorney General seeks to attach the notice and access conditions to the Byrne JAG grant program, and so the natural place to look for authority would be the Byrne JAG statute. Yet as the district court recognized, the Attorney General "fail[s] to direct the Court to any textual authority within the Byrne JAG statute" for imposing the challenged conditions. SA13. This omission persists on appeal. The reason is obvious: The statute does no such thing. To the contrary, the text, structure, and purpose of the Byrne JAG statute *preclude* broad-based, discretionary policy conditions like the notice and access conditions.

*First*, the Byrne JAG statute provides no authority for substantive conditions. Where Congress wants to provide broad-scale, discretionary conditioning authority, it uses a discretionary grant model instead of a formula grant model. *See* Allen, *Federal Grant Practice* § 16:7 (2017) (distinguishing "[n]ondiscretionary" "block or formula programs" from "discretionary" grants, which allow agencies to "exercise judgment in selecting the grantee"); *City of Philadelphia v. Sessions*, No. CV 17-3894, 2017 WL 5489476, at *5 (E.D. Pa. Nov. 15, 2017) (identifying the Byrne JAG program as a mandatory "formula" grant rather than a "discretionary" grant); *see also City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) ("In the formula grant

program the authorizing Act of Congress determines who the recipients are and how much money each shall receive.").  Indeed, in the larger statute that houses the Byrne JAG program, the Omnibus Crime Control and Safe Streets Act of 1968, Congress created a different grant program that expressly authorizes the Attorney General to "impose reasonable conditions on grant awards."  42 U.S.C. § 3796gg-1(e)(3). Congress frequently uses similar language when it wishes to authorize policy conditions on a discretionary basis.  *E.g.*, *id.* § 10305(a)(2) (Secretary can impose conditions he "considers to be in the best interest of the Nation"); 25 U.S.C. § 1652(b) (Secretary authorized to "include such conditions as the Secretary considers necessary to effect the purpose of this subchapter"); 42 U.S.C. § 1769e(b) (similar). But such language is conspicuously absent from the Byrne JAG statute.  "Congress acts intentionally and purposely in the disparate inclusion or exclusion" of statutory text.  *Russello v. United States*, 464 U.S. 16, 23-24 (1983); *see also Jama v. ICE*, 543 U.S. 335, 341 (2005) (courts will not "lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply," especially where Congress has expressly included such text "elsewhere in the same statute"). Accordingly, it is clear that Congress withheld any open-ended authority to impose substantive policy conditions on Byrne JAG grants.

*Second*, the claimed authority to impose broad, substantive conditions on Byrne JAG grantees directly conflicts with multiple express restrictions and instructions in the Byrne JAG statute.  The Byrne JAG statute prescribes a detailed, mandatory

funding allotment formula—commanding that the Attorney General "*shall* allocate" funds, 34 U.S.C. § 10156(d)(2)(A) (emphasis added), "in accordance with" a formula based on population and crime statistics, *id.* § 10152(a)(1); *see* § 10156(d)(2)(A). Unbounded conditioning authority would empower the Attorney General to use the grant as a policy tool *against* local governments by blocking distribution of large chunks of allotted grant funds at will. Indeed, the share for Chicago and the local *amici* in the district court is more than 20% of the funds committed by Congress's formula for local governments. R.884-928. The Attorney General cannot be said to comply with the statute's clear directive that he "shall" allocate Byrne JAG funds "in accordance with" the prescribed formula if he imposes conditions that would distribute only 80% of grant funds using that formula.

The statute also broadly guarantees local governments the opportunity to propose programs tailored to local needs in "any one" of eight expansively defined areas. 34 U.S.C. § 10152(a)(1). And the statute enforces that guarantee by requiring a rule of construction that allows state and local governments to use funds at least as flexibly as they could under the very flexible statutes governing two predecessor programs. *See id.* § 10152(a)(2). Rather than fulfill that guarantee, however, the Attorney General seeks to wield power to dictate local policy priorities.

And most glaringly, the Byrne JAG statute contains a very specific, limited "reserved funds" exception, allowing the Attorney General to exercise a modicum of policy discretion by "reserv[ing] not more than 5 percent" of the program's total

funds to combat "extraordinary increases in crime" or "mitigate significant programmatic harm," if he affirmatively "determin[es]" that doing so is "necessary" to address one of those two important national crime-fighting objectives. 34 U.S.C. § 10157(b). The Attorney General has made neither determination here nor even claimed in litigation that he could make such a determination. And he would impose the conditions not on 5% of the funds, but on every last dollar of Byrne JAG money. Such a brazen effort to condition all Byrne JAG funds, without any predicate findings, on local governments' accession to federal immigration enforcement priorities contradicts both limitations.

*Third*, Congress has shown repeatedly that it knows how to tie Byrne JAG funds to specific federal policy objectives, and it has not done so here. There are multiple statutory provisions limiting Byrne JAG funding for failure to meet specific policy goals. 34 U.S.C. § 20927(a) (reducing Byrne JAG allotments by 10% for failure to substantially comply with the Sex Offender Registration and Notification Act ("SORNA")); *id.* § 30307(e)(2)(A) (requiring 5% reduction in Byrne JAG funds and other grants administered by DOJ for failure to comply with Prison Rape Elimination Act); *id.* § 60105(c)(2) (requiring "not more than a 10-percent reduction" in Byrne JAG funds for failure to comply with Death in Custody Reporting Act). Notably, failure to abide by each of these policies—which Congress deemed sufficiently important that it wrote them into law—results in *at most* a 10% reduction in Byrne JAG funding. Congress has never authorized the Attorney General to declare

jurisdictions wholesale ineligible for their prescribed allocation on policy grounds. In fact, Congress has repeatedly considered, but never enacted, proposed legislation that would condition Byrne JAG funding on local enforcement of federal immigration policies. *E.g.*, Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2(b)(2) (2015) (proposing removal of Byrne JAG funding); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3(b) (2015) (directing Attorney General to "withhold" Byrne JAG funding).

*Finally*, the Attorney General's attempt to transform the Byrne JAG program into a policy cudgel is flatly inconsistent with the program's overarching purpose. Congress enacted the Byrne JAG statute to "give State and local governments more flexibility to spend [federal] money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). Congress intended the Byrne JAG funding to empower local governments by deferring to local policy choices, but now the Attorney General would use those funds to coerce local governments into submission. It is no wonder that he fails to address the Byrne JAG statute in this appeal.

In sum, Congress's design for the Byrne JAG program could not be clearer. It gave the Attorney General limited discretion over matters of technical administration and relied on its own finely tuned formula to guide fund distribution. The Attorney General's asserted conditioning authority is incompatible with the Byrne JAG statute.

**B.  34 U.S.C. § 10102 Does Not Authorize The Notice And Access Policy.**

Rather than address the language of the Byrne JAG statute, the Attorney General rests his argument on 34 U.S.C. § 10102(a)(6), an obscure provision specifying the "Duties and Functions" of the Assistant Attorney General for OJP. The Attorney General's sole argument in this appeal with respect to any possible statutory authority to impose his notice and access policy is that section 10102(a)(6) grants the Assistant Attorney General unlimited power to impose discretionary policy conditions on *all* grants, including the Byrne JAG grant.  That argument is unsupportable as a matter of statutory text and structure.

**1.  The text of section 10102(a)(6) precludes the Attorney General's reading.**

The fundamental difficulty with the Attorney General's argument is that section 10102(a)(6) is not an independent grant of any authority to anyone to impose grant conditions.  Section 10102 lists six duties and corresponding powers of the Assistant Attorney General.  The first five paragraphs describe largely organizational functions, ranging from "disseminat[ing] information on the conditions and progress of the criminal justice system," 34 U.S.C. § 10102(a)(1), to liaising with various federal and local officials, *id.* § 10102(a)(2), (4), to coordinating the work of the offices that report to him, *id.* § 10102(a)(5).

The sixth paragraph, on which the Attorney General rests here, provides that the Assistant Attorney General may also "exercise such other powers and functions as

may be vested in [him] pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6) (emphasis added). The Attorney General emphasizes the second half of that provision, beginning with the word "including," and reads that snippet to confer affirmative authority to impose any condition on any grant. But that is no way to read a statute. The second clause of section 10102(a)(6) does not independently confer any authority at all because its meaning is grammatically and logically limited by the requirements of the first clause—which permits the Assistant Attorney General to "exercise" only whatever power is otherwise properly vested in him by statute or by the Attorney General. The Attorney General's assertion that the second clause independently delegates unlimited conditioning authority is wrong as a matter of text for at least two reasons.

*First*, the word "including" has an established meaning: The grant-conditioning powers in the second clause are a part or subset of powers that "may be vested" in the Assistant Attorney General by this chapter or by delegation from the Attorney General. "To 'include' is to 'contain' or 'comprise as part of a whole.'" *Chickasaw Nation v. United States*, 534 U.S. 84, 89 (2001); *accord Epsilon Elecs., Inc. v. U.S. Dep't of Treasury, Office of Foreign Assets Control*, 857 F.3d 913, 922 (D.C. Cir. 2017) ("Whatever follows the word 'including' is a subset of whatever comes before."). The items following the word "including" are, in other words, "illustrative" of the set of things described before it. *Gaffney v. Riverboat Servs. of Indiana, Inc.*, 451 F.3d 424, 459 (7th Cir.

2006) ("'Including' . . . is interpreted as a word of . . . illustrative application"). The Attorney General contends that he may exercise such powers regardless of whether they are "vested in" him by law or by delegation from the Attorney General. Sessions Br. 19; *see also* R.452 ("[T]he AAG's power must *include*, at a minimum, the power to 'plac[e] special conditions on all grants' administered by OJP, regardless of whether there is 'some independent source of statutory authority.'"). That construction would improperly rewrite "'including' [to] mea[n] 'and' or 'as well as.'" *P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 77 n.7 (1979).

*Second*, the first clause refers to powers ("including" those referenced in the second clause) that "*may* be vested in" the Assistant Attorney General "pursuant to this chapter or by delegation of the Attorney General." This is not itself a source of authority. "May" indicates only an unconsummated possibility. *See Black's Law Dictionary* (10th ed. 2014), "May" ("To be a possibility"). Thus, power must be derived from some other source of law and must actually be vested in the Assistant Attorney General before he may exercise it. In short, "any authority of the Assistant Attorney General to place special conditions on grants must flow either from the statute itself or from a delegation of power independently possessed by the Attorney General." SA18.

The claim that Congress conveyed sweeping authority to the Assistant Attorney General (or to anyone else, for that matter) in section 10102(a)(6) also defies common

sense and basic rules of statutory construction. Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). And it certainly does not do so in ways that would radically alter the federal-state balance of power. *See Gonzales*, 546 U.S. at 274 ("principles of our federal system . . . belie the notion that Congress would use . . . an obscure grant of authority to regulate areas traditionally supervised by the States' police power"). Here, notwithstanding Congress's obligation to "impose . . . condition[s] on the grant of federal moneys . . . unambiguously," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), the Attorney General argues that Congress used a minor amendment to an ancillary provision governing a sub-cabinet post to confer limitless power—wholly unmentioned in and deeply discordant with the grant statute itself—to condition and prioritize those funds at will. That view would be problematic in a statute that clearly said exactly that. And here the Attorney General rests on both a strained reading of the text of section 10102(a)(6) and an improbable theory of congressional intent.

Finally, whatever conditioning authority section 10102(a)(6) describes, it is limited to "special conditions," and here the Attorney General does not even attempt to define the phrase "special conditions," much less explain why the notice and access conditions he seeks to impose here are "special" within the meaning of that term. This avoidance is not surprising because "special condition" has an established

- 27 -

meaning in the federal grant context, both at DOJ and across its sister agencies, and it does not encompass generally applicable policy requirements like the notice and access conditions.

Federal agencies have long imposed "special" conditions on "high-risk" grantees that have a history of performance issues like unsatisfactory program execution or financial irregularity. *See City of Philadelphia*, 2017 WL 5489476, at *27 ("term 'special conditions' . . . is a term of art for conditions intended for 'high-risk grantees' with difficulty adhering to existing grant requirements"); *see also Federal Grant Practice* § 25.4 (awarding agency "may impose 'specific conditions,' or 'special conditions' on the 'high risk' recipient" after assessing "the chances that an applicant will successfully execute a grant" and finding "red flags") (citing Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. § 200.205).

Indeed, DOJ regulations promulgated in 1988 and in effect in 2005 when the "special conditions" language was added to section 10102(a)(6) detail DOJ's approach to imposing "[s]pecial grant or subgrant conditions for 'high risk' grantees" consistent with longstanding practice across the federal government. 28 C.F.R. § 66.12 (in effect from Mar. 11, 1988 to Dec. 25, 2014) (elaborating requirements to be designated "high risk"); *City of Philadelphia*, 2017 WL 5489476, at *27 (elaborating practice of imposing "special conditions" across agencies). The most natural reading of Congress's intention in adding the "special conditions" language in 2005 is to indicate

that such assessments of "high-risk" grantees are the kind of authority Congress

envisioned the Attorney General "vest[ing] in the Assistant Attorney General . . . by

delegation."  34 U.S.C. § 10102(a)(6).

The Attorney General's passing mention of other conditions appearing in past

Byrne JAG award documents, Sessions Br. 14, lends no support to the Attorney

General's reading of section 10102(a)(6).  In addition to the condition regarding 8

U.S.C. § 1373 (which Chicago has also challenged but is not at issue here), the

conditions the Attorney General lists concern information sharing, privacy protection,

protection of human subjects in federally funded research, a list of prohibited and

controlled expenditures, and training requirements for task force members funded

with Byrne JAG funds.  The Attorney General nowhere explains why these other

conditions are relevant to interpreting section 10102(a)(6), and they bear no

resemblance to the notice and access conditions.[6]

### 2. Statutory context confirms that the Attorney General's reliance on section 10102(a)(6) is misplaced.

Rather than address the limiting language in section 10102(a)(6)'s first clause,

the plain meaning of "including," or the definition of the term "special conditions,"

the Attorney General principally argues that Congress must have intended the phrases

"placing special conditions" and "determining priority purposes" to create an

---

[6]     Further, DOJ itself appears to doubt whether all the conditions it calls "special conditions" in the Byrne JAG context are in fact "special"—labeling many of those same conditions as "*General* Conditions for OJP Awards" on the OJP website.  R.878-883 (emphasis added).

independent conditioning power because otherwise those references would be superfluous. That is wrong. As we explain, items following the word "including" are, by definition, "illustrative" of the set of things described before it. *Gaffney*, 451 F.3d at 459 ("'Including' . . . is interpreted as a word of . . . illustrative application"). Reading "including" to indicate illustration—rather than expansion—of the powers that "may be vested" in the Assistant Attorney General explains the inclusion of the "special conditions" language in the provision. Statutory language used for illustrative purposes is not superfluous.

By contrast, it is the Attorney General's reading of section 10102(a)(6) that would generate statutory superfluity. His reading renders numerous specific grants of conditioning authority in the Byrne JAG statute itself superfluous, such as the authority to condition grants on submission of certain "data, records, and information," 34 U.S.C. § 10153(A)(4), and on compliance with a mandatory "program assessment component," *id.* § 10152(e). His reading is also directly contrary to the Byrne JAG statute's "Reserved Funds" provision, which authorizes conditioning no more than 5% of total JAG funds on an applicant's willingness to pursue specific programmatic objectives. *Id.* § 10157(b). And it would render nonsensical Congress's specific statutory instructions to incrementally (but only incrementally) reduce Byrne JAG funds for jurisdictions that fail to comply with the requirements of SORNA, the Prison Rape Elimination Act, and the Death in Custody Reporting Act. *See supra* at 22-23.

And the damage inflicted by the Attorney General's construction of section 10102(a)(6) would reach far beyond the Byrne JAG program. The Attorney General maintains that his powers under section 10102(a)(6) extend to *all* grants. OJP oversees dozens of grant programs totaling nearly $2 billion, R.950-959, and each of those programs has specific constraints and requirements. *E.g.*, 34 U.S.C. §§ 10332-10334 (specific criteria for grants for closed-circuit video testimony of children in criminal child-abuse proceedings); 34 U.S.C. §§ 10591-10593 (specific criteria for grants for certain substance abuse treatment programs). The Attorney General's reading of section 10102(a)(6)—which would permit him to impose any policy conditions on any of these funds regardless of the language in the actual grant program statutes—would nullify Congress's stated requirements for imposing policy conditions on numerous grant programs.

The Attorney General's argument that section 10102(a)(6) grants him authority simply "to add conditions in addition to those established" by statute, Sessions Br. 19, is also wrong. As already explained, the command in the Byrne JAG statute's "Reserved Funds" provision to redirect "not more than" 5% of the Byrne JAG funds, 34 U.S.C. § 10157(b), forecloses the power to add conditions on 100% of funds. Other grant authorizations within the same chapter likewise use language that sharply constrains the Attorney General's discretion. Subchapter XXXI, for instance, mandates that "[t]he Attorney General *shall* make grants" for adult offender reentry programs and provides that he "*shall* give priority to grant applications" meeting

certain conditions set forth in the statute. *Id.* § 10631(f). This language precludes reading section 10102 to also permit the Attorney General to tinker with the grant criteria in any way he pleases. "The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive." *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661 (2007). And as the district court noted, SA14-15, the Director of the Bureau of Justice Assistance has authority to "awar[d] and allocat[e] funds" in the discretionary grants under his purview "on terms and conditions determined by the Director to be consistent with part B of subchapter V of this chapter." 34 U.S.C. § 10142(2). Congress would not have vested the Director with authority to set the "terms and conditions" for those grants if it also intended the Assistant Attorney General to add other terms or conditions.

And there are other problems with the Attorney General's reading beyond its treatment of the word "including" and its unsupported interpretation of section 10102(a)(6) as an independent grant of general authority to condition funds. However section 10102(a)(6) is read, the more specific provisions of the individual grant programs must still be given effect. It is a "commonplace [rule] of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). "That is particularly true, where . . . Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645

(2012). In short, the specific grants of authority in the Byrne JAG statute and its sister grant programs should be given effect, rather than swallowed whole by the Attorney General's reading of section 10102.

Rather than addressing these critical textual and structural flaws in his construction of section 10102, the Attorney General quibbles with marginal issues. For example, the Attorney General criticizes the district court's suggestion that section 10102(a)(6) may not apply to the Byrne JAG grant at all. Sessions Br. 18. Those criticisms are incorrect, but more important, they do not go to the heart of the matter: Whether or not section 10102 applies to the Byrne JAG program (and the district court assumed that it *did* apply), that provision still does not confer any standalone power to impose new policy conditions on federal grants. And in any event, the district court's skepticism about section 10102's scope was well-grounded. Section 10102 appears in a subchapter that establishes OJP and confers limited authority on its head, the Assistant Attorney General. As the district court observed, there is "no textual reference that applies [that subchapter] to the rest of the chapter or specifically the Byrne JAG program," which includes grants administered in the first instance by the Bureau of Justice Assistance rather than OJP. SA14. Nothing in the text or structure of the statute supports the conclusion that in referring to the Assistant Attorney General's limited authority over grants within his direct control, section 10102(a)(6) also granted authority over all grants in chapter 101.

In another tangent, the Attorney General attempts to respond to the district court's conclusion that his reading of section 10102(a)(6) would render superfluous Congress's express grant of authority to impose "reasonable conditions" on grants to combat violence against women authorized by the Violence Against Women Act ("VAWA"), 34 U.S.C. § 10446(e)(3), because that provision also appears in chapter 101. SA16. The Attorney General contends that this does not matter because OJP does not administer the VAWA grant program. Sessions Br. 20. But given the Attorney General's insistence that the "including" clause is not constrained by the surrounding text in section 10102(a)(6) and thus empowers him to impose any condition on any grant in the same statutory chapter, it plainly does not matter whether OJP or some other office administers VAWA grants.

In sum, the only federal statute that the Attorney General cites as authorizing his new conditions provides him with no such authority—which is why the district court correctly enjoined them as *ultra vires*.

## C. Neither The Attorney General's Policy Priorities, Nor The Structure Of Immigration Law, Authorizes The Notice And Access Policy.

Ultimately, the Attorney General suggests that he does not need any statutory authorization to impose his notice and access conditions. He contends that the requirement that authority to impose conditions on formula grant be "expressly established by statute" is merely the district court's "theory." Sessions Br. 17. That is a remarkable departure from bedrock principles of agency authority—and particularly

jarring coming from the Nation's top law enforcement officer, who one would expect to be especially committed to the rule of law. The Attorney General does not claim that the Constitution grants the Executive inherent power to impose the notice and access conditions. And it is fundamental that outside of such constitutional powers, an agency "has no power to act . . . unless and until Congress confers power upon it." *Louisana*, 476 U.S. at 374; *accord Wabash Valley Power Ass'n v. Rural Electrification Admin.*, 988 F.2d 1480, 1486 (7th Cir. 1993) (same); *Marquette Cement Mfg. Co. v. FTC*, 147 F.2d 589, 594 (7th Cir. 1945) ("[Agencies] are the creatures of Congress and it is not within the province of courts either to emasculate or enlarge the powers which it has conferred.").

There is no exception to that basic rule for what the Attorney General claims are important policies. Sessions Br. 17 (suggesting that the conditions are authorized because Attorney General has identified "cooperation in immigration enforcement" as "a federal priority"). Where "Congress prescribes the form in which an agency"— there, the Department of Transportation—"may exercise its authority," courts may not "elevate the goals of an agency's action, however reasonable, over that prescribed form." *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364 (D.C. Cir. 1990); *see also Pennhurst*, 451 U.S. at 17 (where Congress's proscribed form is conditions on spending grants, authority to impose those conditions must be "unambiguou[s]").

It merits note, moreover, that the Attorney General relies on policy descriptions riddled with factual inaccuracies and overstatements. For instance, the

Attorney General's claim that his notice and access policy targets "criminal aliens," Sessions Br. 4, is belied by the text of the conditions, which remarkably does not even limit its terms to "aliens," but instead applies to *all* individuals who federal agents "believ[e] . . . to be" "aliens," whether or not they are and whether or not that individual has been charged or convicted of a crime. App.62-63 (conditions apply to "individuals who are (or are believed by such agents to be) aliens").

And the facts easily refute the Attorney General's suggestion that the challenged policy is needed to enforce immigration law against "criminal aliens" in Chicago. As the district court in Philadelphia explained in a parallel challenge, the term "criminal aliens" means non-citizens "who have been convicted of serious crimes, or have reentered the United States after being deported" and is a "category [that] represents a fairly small percentage of the total number of non-citizens." *City of Philadelphia*, 2017 WL 5489476, at *3. That label is thus grossly inapt when applied to all individuals held briefly in Chicago's "lock-up" facilities—who generally have not even been charged with, let alone convicted of, any crime. R.50-51, R.182. And contrary to the Attorney General's suggestions, Chicago's WCO expressly permits cooperation with immigration authorities regarding individuals who have a history of serious crimes or are identified as known gang members. R.244-245 (§ 2-173-042).

Similarly misguided is the Attorney General's contention that his policy is designed to prevent jurisdictions from "thwart[ing] federal law enforcement." Sessions Br. 12. The Constitution prohibits local government officials from being

pressed into the enforcement of federal laws—immigration or otherwise. *Printz v. United States*, 521 U.S. 898, 919-923 (1997). Declining to voluntarily assist federal law enforcement is not "thwart[ing]" it; it is hewing to the constitutional design by using local resources to address local needs, while leaving to the federal government the choice to spend federal resources to address federal needs. *Id.* Policy objectives, much less these spurious ones, are no substitute for actual statutory authorization, which is lacking here.

Nor can the Attorney General inflect his policy goals with legal authority by invoking the "structure" of, and "implicit premise[s]" in, the INA. Sessions Br. 11, 16. The Attorney General contends that the "structure of the Immigration and Nationality Act" "contemplates" a "cooperative law enforcement framework," in which state and local governments voluntarily respond to requests for release dates and allow federal officials access to criminal aliens, as the notice and access policy would require. *Id.* at 16. But the cited INA provisions refer to duties of *federal* officers only; they impose no legal obligations on state or local governments nor specify any mechanism for them to assist in federal immigration enforcement, much less clearly authorize the grant process for Byrne JAG funds to secure that assistance. *E.g.*, 8 U.S.C. § 1226(c)(1) (requiring federal agents to take certain criminal aliens into custody); *id.* § 1231(a)(1)(B) (requiring federal agents to remove aliens subject to a

removal order within 90 days).[7]  To be sure, it may be easier to take certain non-citizens into custody or remove them quickly if state and local governments provide voluntary assistance.  But that does not allow the Attorney General to force such assistance through conditions on a grant, absent a statute creating such power.

*     *     *

The Attorney General's final objection—that the district court improperly invested its holding with "constitutional significance" where the Attorney General at most made an "error in grant administration"—is deaf to the significant constitutional stakes of the Attorney General's actions.  As Chicago has explained throughout this litigation, separation of powers and principles of federalism are the twin pillars of our constitutional order; they ensure that the Executive may neither arrogate legislative power to himself, nor use such ill-gotten power to improperly curtail local autonomy and self-government.  These protections thus provide "a double security . . . to the rights of the people."  Federalist No. 51 (Madison).  The Attorney General's invention of notice and access conditions without statutory authorization threatens both these principles and violates principle after principle used to guide proper statutory construction in this sensitive area.  *See, e.g.*, *Gregory*, 501 U.S. at 461 (insisting on a "clear statement" ensures that the federal government does not overreach in

---

[7]      In contrast, a different provision of the INA, which the Attorney General does not mention, elaborates specific ways in which state and local governments can assist federal immigration enforcement and precisely how that voluntary cooperation should be obtained and managed, 8 U.S.C. § 1357(g), indicating that when Congress actually "contemplates" cooperation, it establishes detailed legal regimes to facilitate it.

"traditionally sensitive areas" of local concern and so alter "the federal balance");

*Pennhurst*, 451 U.S. at 18 (courts must "carefully inquire" whether Congress

"unambiguously" "imposed an obligation" on local government "as a condition of

receiving federal moneys"). It is not mere "error" for the official tasked with

enforcing the Nation's laws to claim authority to intrude in an area of intimate local

concern regardless of whether Congress authorized him to do so. The district court

properly enjoined the Attorney General's *ultra vires* policy, and this court should

affirm.

## II. THE DISTRICT COURT PROPERLY ENJOINED THE ATTORNEY GENERAL'S UNLAWFUL NOTICE AND ACCESS POLICY ACROSS-THE-BOARD.

The Attorney General's challenge to the scope of the district court's injunction

fares no better than his challenge to the district court's handling of the merits. Having

properly determined that the Attorney General's uniform, national policy is unlawful

and unconstitutional, the district court had the power under Article III to enjoin that

policy in full, rather than permit the Attorney General to continue to foist it on every

jurisdiction in the country other than Chicago. And the court acted well within its

ample discretion in choosing to exercise that broad and flexible power given the

nature of the case, the parties, and the harm before it.

### A. Chicago Has Standing To Seek An Injunction That Benefits Other Jurisdictions Harmed By The Same Unlawful And Unconstitutional Policy That Harms Chicago.

Federal courts possess "the judicial Power of the United States," U.S. Const. art. III, § 1, which includes the "broad power to restrain acts" by injunction, *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 504 (7th Cir. 2008) (quoting *NLRB v. Express Pub'g Co.*, 312 U.S. 426, 435-437 (1941)). So long as a live "case" or "controversy" exists, U.S. Const. art. III, § 2, this injunctive power extends fully to each of the "parties" properly before the court, *see* Fed. R. Civ. P. 65(d). To satisfy Article III's "case" or "controversy" requirement, a plaintiff must establish standing for each *claim* and for each particular *form* of relief sought (be it prospective or retrospective). *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press."); *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (plaintiff "bears the burden of showing that he has standing for each type of relief sought"). But once that threshold obligation is satisfied, Article III imposes no additional constraint at the remedy phase of a case on the *scope* of the injunction that a court may order. Rather, "the nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation." *Missouri v. Jenkins*, 515 U.S. 70, 88, 89 (1995); *accord Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("the scope of injunctive relief is dictated by the extent of the violation established"); *Koo v. McBride*, 124 F.3d 869, 873 (7th Cir. 1997) (same).

These principles readily establish that the district court possessed "judicial Power" under Article III to issue the injunction it entered in this case. The Attorney General does not contest that Chicago has Article III standing to assert the *claim* that his policy of imposing notice and access conditions on Byrne JAG grantees is unlawful. Nor does he dispute Chicago's standing to seek relief in the *form* of an injunction against that policy. And for good reason. The "irreducible constitutional minimum" of standing requires only that a plaintiff "(1) suffer an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). And here, Chicago indisputably suffers an ongoing and imminent harm from the Attorney General's policy that would be redressed by an injunction setting aside that policy. A live controversy over the Attorney General's policy therefore exists, giving the district court the power to adjudicate the violation— imposition of conditions that "violate the separation of powers doctrine and are *ultra vires*," SA19—and to tailor an injunction to remedy that violation. And that is exactly what the district court did here: It enjoined the Attorney General from carrying out the precise policy that it had found unlawful.

Given these principles, the Attorney General's argument that federal courts exceed their Article III "judicial Power" when they enjoin a single law, regulation, or uniform administrative policy in full, rather than issuing an injunction limited to the plaintiff, Sessions Br. 21-25, plainly fails.

The Attorney General's new rule would upend the well-settled judicial authority to invalidate unconstitutional laws on their face, a practice that almost always reaches beyond the plaintiff to benefit individuals not before the court. *E.g. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2307 (2016) ("[I]f the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is 'proper.'"); *Obergefell v. Hodges*, 135 S. Ct. 2584, 2604-2605 (2015) (affirming injunction restraining state prohibitions on same-sex marriage on basis of claims brought by individual same-sex couples); *Wisconsin v. Constantineau*, 400 U.S. 433, 439 (1971) (affirming invalidation on due-process grounds of Wisconsin statute that required retail liquor outlets to post lists of individuals to whom liquor could not be sold, in suit brought by single individual whose name appeared on list); *Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011) (affirming injunction against enforcement of Wisconsin statute on the basis of Eighth Amendment challenge brought by three inmates); *Horina v. City of Granite City, Ill.*, 538 F.3d 624, 636 (7th Cir. 2008) (affirming facial invalidation of ordinance on First Amendment grounds in suit by single individual); *see also, e.g., Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) (enjoining gun law in case brought by individuals denied gun licenses).

And the Attorney General's rule would also abrogate the traditional power of the courts to "hold unlawful and set aside" agency action, 5 U.S.C. § 706(2), thus rendering unconstitutional under Article III the "ordinary result" when a court finds agency action unlawful: "that the rules are vacated—not that their application to the

individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21

(D.C. Cir. 1989); *see also, e.g.*, *Texas v. United States*, 809 F.3d 134, 187-188 & n.211 (5th

Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016) (affirming nationwide

injunction against federal immigration policy); *Owner-Operator Ind. Drivers Ass'n v. Fed.

Motor Carrier Safety Admin.*, 656 F.3d 580, 589 (7th Cir. 2011) (vacating truck

monitoring rule in suit by three drivers and trade association); *Decker v. O'Donnell*, 661

F.2d 598, 618 (7th Cir. 1980) (enjoining federal statute and regulation in facial

challenge by three taxpayers).

Indeed, just this year the Supreme Court left in place portions of a nationwide

injunction against a uniform federal administrative policy in *Trump v. International

Refugee Assistance Project*, 137 S. Ct. 2080 (2017) (*IRAP II*), over express objections of

dissenting Justices "mak[ing] the exact argument the Attorney General advances

here," App.107. *See also* 7th Cir. Dkt. 8, at 18 (Attorney General agreeing that *IRAP II*

dissenters "sided with the government"). While narrowing the injunction that had

been issued by lower courts against the travel ban Executive Order, the Court upheld

the injunction "with respect to parties similarly situated to [the individual plaintiffs]"

who had brought the case. *IRAP II*, 137 S. Ct. at 2088. And it did so even in the face

of the dissent's express concern that "a court's role is 'to provide relief' only 'to

claimants.'" *Id.* at 2090. Plainly, a majority of the Court *rejected* that jurisdictional

argument. *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) ("'the first

and fundamental question is that of jurisdiction," which "the court is bound to ask and answer for itself, even when not otherwise suggested'").

The Attorney General contends this longstanding judicial practice should be ignored because these cases "did not address the issue of Article III standing" and "'the existence of unaddressed jurisdictional defects has no precedential effect.'" Sessions Br. 25. That principle does not apply where there is a "decades-long understanding prevailing on this issue." *Hibbs v. Winn*, 542 U.S. 88, 111-112 (2004) (finding it significant that "[i]n a procession of cases not rationally distinguishable from this one" no court had ever "order[ed] dismissal of the action for want to jurisdiction"). This court should not "disregard the implications of an exercise of judicial authority assumed to be proper for [decades]." *Brown Shoe Co. v. United States*, 370 U.S. 294, 307 (1962); *see also Bank of United States v. Deveaux*, 9 U.S. (5 Cranch) 61, 88 (1809) (Marshall, C.J.) (where court "repeatedly . . . decided [cases]" of a particular nature "without feeling a doubt respecting its jurisdiction," those cases "have much weight"). And that is especially true where, as here, the prior cases are "adjudications of great moment discerning no [jurisdictional] barrier." *Hibbs*, 542 U.S. at 112 n.13. Such cases "cannot be written off as reflecting nothing more than unexamined custom or unthinking habit," *id.*—particularly given the Court's "fundamental" "obligation to assure [itself]' of litigants' standing under Article III," *sua sponte* if necessary. *DaimlerChrysler Corp.*, 547 U.S. at 340 (internal quotation marks omitted).

In the face of this precedent, the Attorney General leans on quotes plucked out of context from the Supreme Court's general standing and mootness canon. But none of the cases the Attorney General cites addressed the issue here—a district court's broad remedial power to grant injunctive relief on a claim that the plaintiff indisputably has standing to assert.[8] And the maxim that the Attorney General highlights from those cases—that "standing is not dispensed in gross"—is fully vindicated by the requirements that a plaintiff establish standing for each *claim* and for each *form* of relief (such as damages, an injunction, declaratory relief, or civil penalties). *See Summers*, 555 U.S. at 493.[9] As we explained above, and longstanding

---

[8]     Thus, for example, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010), and *Laskowski v. Spellings*, 546 F.3d 822 (7th Cir. 2008), decided only that plaintiffs lacked standing to advance particular *claims* or to seek a particular *form* of relief—but did not address the *scope* of relief in an otherwise live controversy. The same is true of the mootness cases the Attorney General cites. *See Alvarez v. Smith*, 558 U.S. 87, 92 (2009) (plaintiff had no live claim because any harm caused to him by the challenged practice had already been remedied); *Summers*, 555 U.S. at 494 (same).

[9]     *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("plaintiff must demonstrate standing separately for each *form* of relief sought" (emphasis added)); *Summers*, 555 U.S. at 493 (plaintiff "bears the burden of showing that he has standing for each *type* of relief sought" (emphasis added)); *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (standing "often turns on the *nature* . . . of the claim asserted" (emphasis added)); *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (affirming plaintiff's standing to seek damages, but not injunctive relief); *DaimlerChrysler Corp.*, 547 U.S. at 352 ("a plaintiff must demonstrate standing for each *claim* he seeks to press" (emphasis added)).

judicial practice reflects, that maxim does not limit the *scope* of relief that a district court may order, once it has resolved the merits of such a claim.[10]

The Attorney General also relies heavily on two cases from this court, but both are inapposite. They involved plaintiffs who had effectively sought to assert additional, distinct *claims* beyond the individual claims they had standing to assert. *McKenzie v. City of Chicago*, 118 F.3d 552 (7th Cir. 1997), involved fact-specific due process challenges to a demolition ordinance that could be resolved only on an as-applied basis because plaintiffs' claims, even if meritorious, would not have proven the ordinance unlawful as applied to other plaintiffs in different circumstances. *Id.* at 557-559 (describing claims relating to insufficient process, fees charged to indigent property owners, and risk of erroneous demolition). In that context, where, as a practical matter, plaintiffs sought adjudication of claims that depended on facts unique to other parties, plaintiffs "lack[ed] standing to seek—and the district court therefore lack[ed] authority to grant—relief that benefit[ed] third parties" not before the court. *Id.* at 555.

Likewise, in *Scherr v. Marriott International, Inc.*, 703 F.3d 1069 (7th Cir. 2013), this court analyzed the plaintiff's case as involving distinct claims against fifty-seven separate hotels, each of which had installed the same spring hinge that had injured her when she stayed at one of the hotels. *E.g.*, *id.* at 1073 ("Scherr has standing to bring

---

[10]   For purposes of standing, it is immaterial whether the violation is constitutional or statutory; as the Attorney General admits, Sessions Br. 24-25, the rules of standing are the same for each.

her suit against the Overland Park Courtyard Marriott but not the other hotels").
Because the plaintiff had established concrete plans to stay at only one hotel, she
lacked standing to pursue any claim against the other fifty-six. *See id.* at 1075.
*McKenzie* and *Scherr* thus stand for nothing more than the unremarkable proposition
that standing must be established for each separate claim. And they cast no doubt on
the power of courts adjudicating a single claim against a uniform policy to enjoin that
policy in full when there is "no reason to think that . . . the statutory authority given
to [the defendant] would differ in another jurisdiction." SA 41. The Attorney
General's jurisdictional argument, not even raised in opposition to the motion for
preliminary injunction, should be rejected.

**B.    The District Court Acted Within Its Discretion In Enjoining The
        New Conditions.**

Because there is no Article III problem, the Attorney General is left with a
single argument against the injunction: that the district court abused its discretion in
entering an injunction that recognized the facial invalidity of the notice and access
policy by enjoining it across-the-board. Sessions Br. 25-26. A court has substantial
latitude to "mold each decree to the necessities of the particular case and to remedy
the consequences of past constitutional violations," *Gautreaux v. Chicago Housing Auth.*,
690 F.2d 601, 609 (7th Cir. 1982), for "breadth and flexibility are inherent in equitable
remedies," *Preston v. Thompson*, 589 F.2d 300, 303 (7th Cir. 1978) (quoting *Swann v.
Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)). Reflecting this, "the

appropriate scope of the injunction is left to the district court's sound discretion."
*Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 307 (7th Cir. 2010); *see also, e.g., H-D Mich., LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 843 (7th Cir. 2012).

The district court did not abuse that discretion here. Because this case involves a facial challenge to a single, nationally integrated federal policy, imposed through a formula grant program under which each recipient's funding award is affected by the awards made to other jurisdictions, the district court held that "there is no reason to think that the legal issues present in this case," or the relevant facts, "would differ in another jurisdiction." SA41. This holding flows directly from the long line of cases we cite upholding the federal courts' ability to invalidate a facially unlawful statute or policy. The district court's order was thus the ordinary practice: When a court "strike[s] down a statute, rule, or ordinance on the ground that it is constitutionally offensive," that relief "generally will benefit not only the claimant but all other persons subject to the practice or the rule under attack." Wright & Miller, *Federal Practice & Procedure* § 1771 (3d ed. 2017). And indeed, this court has affirmed a nationwide injunction against a federal department on these very grounds. In *Decker*, this court explained that, despite being brought by individual plaintiffs in Milwaukee, the case had "evolved . . . into one challenging the facial constitutionality of [a] statute and of the Department of Labor's [implementing] regulation," making a nationwide injunction proper. 661 F.2d at 618; *see also Dayton Bd. of Educ. v. Brinkman*, 433 U.S.

406, 420 (1977) ("[I]f there has been a systemwide impact . . . there [may] be a systemwide remedy.").

The Attorney General's own position before this court offers yet another reason for a nationwide injunction. His motion seeking a stay of the district court's injunction announced that, if a stay were granted, he would impose the unlawful notice and access conditions on the nearly 1,000 other jurisdictions that have applied for Byrne JAG funds, including jurisdictions participating as *amici* in this case. 7th Cir. Dkt. 8, at 2; *see also* R.1080 (claiming that a stay would "preserv[e] the Department's ability to pursue imposing the notice and access conditions for 2017 Byrne JAG grants"). Broad injunctions are particularly proper where "a proclivity for unlawful conduct has been shown." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949) (cited in *Russia Media Grp.*, 598 F.3d at 307).

None of the cases the Attorney General cites requires vacatur of the district court's well-supported injunction. He first points to the general principle that injunctions should "be no more burdensome to the defendant than necessary to provide complete relief." Sessions Br. 25. But that principle gives way where, as here, the plaintiff has a successful claim that the defendant's action is facially unlawful. "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano*, 442 U.S. at 702. The Attorney General also has little recourse to arguments that the preliminary injunction significantly burdens him. Such an order, as the Attorney General acknowledges, is

intended to preserve the status quo. Sessions Br. 26. An order that "merely return[s] the nation temporarily to the position it has occupied for many previous years" by restraining the federal government from implementing a nationwide policy accomplishes precisely that goal. *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017), *cert. denied*, 2017 WL 3224674 (U.S. Nov. 13, 2017) (No. 17-5424).[11]

The Attorney General then selectively cites out-of-circuit cases to suggest that the general practice in both the Fourth and Ninth Circuits is to vacate injunctions to the extent they grant relief to parties not before the court. Sessions Br. 25-26 (citing *Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379 (4th Cir. 2001), and *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644 (9th Cir. 2011)). That is incorrect. Elsewhere, the Ninth Circuit has recognized that "an injunction is not necessarily made over-broad by extending benefit to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled," *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987), and has applied that principle to uphold a nationwide injunction where

---

[11]     Nor is class status required in this case, as the Attorney General suggests. Sessions Br. 26. Class status would be required to bind *non-parties* to the litigation, but it is not required to enjoin a defendant already before the court from taking unlawful action. *See* Fed. R. Civ. P. 65(d); *cf.* Fed. R. Civ. P. 71. Indeed, pre-1966 decisions granting blanket relief from an unlawful government policy were the model for Rule 26(b)(2), which provides for mandatory class status in cases seeking injunctive relief. *E.g., Bailey v. Patterson*, 323 F.2d 201, 206 (5th Cir. 1963) ("whether or not appellants may properly represent all Negroes similarly situated [as a formal class action], the decree to which they are entitled is the same") (cited in Fed. R. Civ. P. 23, Advisory Comm. Notes to 1966 Amendments).

relief limited to the plaintiffs "would not cure the statutory violations identified," *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017), *vacated as moot on appeal*, 874 F.3d 1112 (9th Cir. 2017); *see also Washington v. Trump*, 847 F.3d 1151 (affirming district court's entry of nationwide injunction against Executive Order 13769). Thus, the Ninth Circuit has recognized that, when a policy is unlawful in all its applications, it is within a court's discretion to enjoin it completely.

Likewise, the Fourth Circuit recently recognized that a district court, in its discretion, may enter a nationwide injunction against a federal policy if doing so is "necessary to cure the constitutional deficiency, which would endure in all [the policy's] applications." *Int'l Refugee Assistance Project v. Trump ("IRAP I")*, 857 F.3d 554, 605 (4th Cir. 2017), *vacated as moot on appeal*, 138 S. Ct. 353 (2017) (mem.).[12] The Attorney General attempts to distinguish this case, Sessions Br. 28-29, but his attempts are unavailing. While the Fourth Circuit did note that the *IRAP I* plaintiffs were "dispersed throughout the United States," it relied on this point only to establish that "challenged conduct caused irreparable harm in myriad jurisdictions across the country." 857 F.3d at 605. The same is true here: Jurisdictions from across the country rushed to participate in this lawsuit and express their support for a nationwide preliminary injunction. Those jurisdictions ranged from Cook County and other sub-

---

[12] The order vacating *IRAP I* as moot "express[ed] no view on the merits," 138 S. Ct. at 353, and the Fourth Circuit's decision thus "still 'constitutes persuasive authority.'" *In re Motors Liquidation Co.*, 829 F.3d 135, 156 n.23 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1813 (2017).

grantees of Byrne JAG funds Chicago receives, to thousands of local governments that participated either directly as *amici* or indirectly through national organizations of which they are members. R.592, R.645, R.767. And the Attorney General's claim that "this case involves the administration of a federal grant program, rather than the application of immigration law to foreign nationals," Sessions Br. 28, is belied by his own brief, which defends the policy as part of the Administration's immigration enforcement program, *id.* at 11, 15, 17. Finally, as in *IRAP I*, allowing the challenged violation to continue against non-plaintiffs would have broader effects, given the structure of Byrne JAG statute's allocation formula, by which all applicants draw funds from a single pool. *See supra* at 4-5 (describing allocation procedure).

At bottom, the Attorney General's complaint seems to be that that the nationwide injunction is unfair because it does "not foreclose any other grant applicant from bringing suit" while at the same time it "foreclose[s] the United States from enforcing the grant conditions regardless of whether it would be able to prevail in other courts." Sessions Br. 27-28. There is no unfairness here. The Attorney General is a party to this litigation, and he is foreclosed from enforcing the grant conditions because they are unlawful. Courts have broad power to remedy violations of the law by enjoining a party before them, and that is all the court did here—it ordered the Attorney General to desist from unlawful conduct. At the same time, non-parties are not foreclosed precisely because they are non-parties. As in numerous other cases in which a court has correctly determined that a unitary administrative

policy is facially invalid, the district court here did not abuse its discretion in preliminarily enjoining the Attorney General's notice and access conditions across-the-board.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Edward N. Siskel

| | |
|---|---|
| JAMIE S. GORELICK | EDWARD N. SISKEL |
| DAVID W. OGDEN | Corporation Counsel of the City of Chicago |
| ARI HOLTZBLATT | BENNA RUTH SOLOMON |
| ARI SAVITZKY | Deputy Corporation Counsel |
| MOLLY M. JENNINGS | MYRIAM ZRECNY KASPER |
| TIFFANY WRIGHT | ANDREW W. WORSECK |
| BRIDGET FAHEY* | Chief Assistant Corporation Counsel |
| WILMER CUTLER PICKERING | JUSTIN A. HOUPPERT |
| HALE AND DORR LLP | SCOTT D. SPEARS |
| 1875 Pennsylvania Avenue NW | Assistant Corporation Counsel |
| Washington, DC 20006 | 30 N. LaSalle Street, Suite 800 |
| (202) 663-6000 | Chicago, IL 60602 |
| | (312) 744-7764 |
| DEBO P. ADEGBILE | |
| ADRIEL I. CEPEDA DERIEUX | RONALD S. SAFER |
| WILMER CUTLER PICKERING | MATTHEW C. CROWL |
| HALE AND DORR LLP | NICK KAHLON |
| 7 World Trade Center | LAURA KLEINMAN |
| 250 Greenwich Street | TAL CHAIKEN |
| New York, NY 10007 | RILEY SAFER HOLMES & CANCILA LLP |
| (212) 230-8800 | Three First National Plaza |
| | 70 West Madison Street, Suite 2900 |
| * *Admitted to practice only in Colorado.* | Chicago, IL 60602 |
| *Supervised by members of the firm who are* | (312) 471-8700 |
| *members of the District of Columbia Bar.* | |

December 28, 2017

# STATUTORY ADDENDUM

# ADDENDUM TABLE OF CONTENTS

Page

34 U.S.C. § 10151 ...................................................................... Add. 1

34 U.S.C. § 10152 ...................................................................... Add. 2

34 U.S.C. § 10153 ...................................................................... Add. 4

34 U.S.C. § 10154 ...................................................................... Add. 7

34 U.S.C. § 10155 ...................................................................... Add. 8

34 U.S.C. § 10156 ...................................................................... Add. 9

34 U.S.C. § 10157 ...................................................................... Add. 14

34 U.S.C. § 10158 ...................................................................... Add. 15

34 U.S.C. § 10102 ...................................................................... Add. 16

## 34 U.S.C. § 10151

(a) In general

   The grant program established under this part shall be known as the "Edward Byrne Memorial Justice Assistance Grant Program".

(b) References to former programs

   (1) Any reference in a law, regulation, document, paper, or other record of the United States to the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs, or to the Local Government Law Enforcement Block Grants program, shall be deemed to be a reference to the grant program referred to in subsection (a).

   (2) Any reference in a law, regulation, document, paper, or other record of the United States to section 506 of this Act as such section was in effect on the date of the enactment of the Department of Justice Appropriations Authorization Act, Fiscal Years 2006 through 2009, shall be deemed to be a reference to section 505(a) of this Act as amended by the Department of Justice Appropriations Authorization Act, Fiscal Years 2006 through 2009.

# 34 U.S.C. § 10152

(a) Grants authorized

 (1) In general

 From amounts made available to carry out this part, the Attorney General may, in accordance with the formula established under section 3755 of this title, make grants to States and units of local government, for use by the State or unit of local government to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of the following programs:

  (A) Law enforcement programs.

  (B) Prosecution and court programs.

  (C) Prevention and education programs.

  (D) Corrections and community corrections programs.

  (E) Drug treatment and enforcement programs.

  (F) Planning, evaluation, and technology improvement programs.

  (G) Crime victim and witness programs (other than compensation).

  (H) Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams.

 (2) Rule of construction

 Paragraph (1) shall be construed to ensure that a grant under that paragraph may be used for any purpose for which a grant was authorized to be used under either or both of the programs specified in section 3750(b) of this title, as those programs were in effect immediately before January 5, 2006.

(b) Contracts and subawards

A State or unit of local government may, in using a grant under this part for purposes authorized by subsection (a) of this section, use all or a portion of that grant to contract with or make one or more subawards to one or more--

 (1) neighborhood or community-based organizations that are private and nonprofit; or

 (2) units of local government.

 (3) Repealed. Pub.L. 109-271, § 8(h)(3), Aug. 12, 2006, 120 Stat. 767

(c) Program assessment component; waiver

> (1) Each program funded under this part shall contain a program assessment component, developed pursuant to guidelines established by the Attorney General, in coordination with the National Institute of Justice.

> (2) The Attorney General may waive the requirement of paragraph (1) with respect to a program if, in the opinion of the Attorney General, the program is not of sufficient size to justify a full program assessment.

(d) Prohibited uses

Notwithstanding any other provision of this Act, no funds provided under this part may be used, directly or indirectly, to provide any of the following matters:

> (1) Any security enhancements or any equipment to any nongovernmental entity that is not engaged in criminal justice or public safety.

> (2) Unless the Attorney General certifies that extraordinary and exigent circumstances exist that make the use of such funds to provide such matters essential to the maintenance of public safety and good order--

>> (A) vehicles (excluding police cruisers), vessels (excluding police boats), or aircraft (excluding police helicopters);

>> (B) luxury items;

>> (C) real estate;

>> (D) construction projects (other than penal or correctional institutions); or

>> (E) any similar matters.

(e) Administrative costs

Not more than 10 percent of a grant made under this part may be used for costs incurred to administer such grant.

(f) Period

The period of a grant made under this part shall be four years, except that renewals and extensions beyond that period may be granted at the discretion of the Attorney General.

(g) Rule of construction

Subparagraph (d)(1) shall not be construed to prohibit the use, directly or indirectly, of funds provided under this part to provide security at a public event, such as a political convention or major sports event, so long as such security is provided under applicable laws and procedures.

# 34 U.S.C. § 10153

(a) In general

To request a grant under this part, the chief executive officer of a State or unit of local government shall submit an application to the Attorney General within 120 days after the date on which funds to carry out this part are appropriated for a fiscal year, in such form as the Attorney General may require. Such application shall include the following:

> (1) A certification that Federal funds made available under this part will not be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of Federal funds, be made available for law enforcement activities.

> (2) An assurance that, not fewer than 30 days before the application (or any amendment to the application) was submitted to the Attorney General, the application (or amendment) was submitted for review to the governing body of the State or unit of local government (or to an organization designated by that governing body).

> (3) An assurance that, before the application (or any amendment to the application) was submitted to the Attorney General--

>> (A) the application (or amendment) was made public; and

>> (B) an opportunity to comment on the application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure makes such an opportunity available.

> (4) An assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require.

> (5) A certification, made in a form acceptable to the Attorney General and executed by the chief executive officer of the applicant (or by another officer of the applicant, if qualified under regulations promulgated by the Attorney General), that--

>> (A) the programs to be funded by the grant meet all the requirements of this part;

>> (B) all the information contained in the application is correct;

>> (C) there has been appropriate coordination with affected agencies; and

(D) the applicant will comply with all provisions of this part and all other applicable Federal laws.

(6) A comprehensive Statewide plan detailing how grants received under this section will be used to improve the administration of the criminal justice system, which shall--

(A) be designed in consultation with local governments, and representatives of all segments of the criminal justice system, including judges, prosecutors, law enforcement personnel, corrections personnel, and providers of indigent defense services, victim services, juvenile justice delinquency prevention programs, community corrections, and reentry services;

(B) include a description of how the State will allocate funding within and among each of the uses described in subparagraphs (A) through (G) of section 3751(a)(1) of this title;

(C) describe the process used by the State for gathering evidence-based data and developing and using evidence-based and evidence-gathering approaches in support of funding decisions;

(D) describe the barriers at the State and local level for accessing data and implementing evidence-based approaches to preventing and reducing crime and recidivism; and

(E) be updated every 5 years, with annual progress reports that--

(i) address changing circumstances in the State, if any;

(ii) describe how the State plans to adjust funding within and among each of the uses described in subparagraphs (A) through (G) of section 3751(a)(1) of this title;

(iii) provide an ongoing assessment of need;

(iv) discuss the accomplishment of goals identified in any plan previously prepared under this paragraph; and

(v) reflect how the plan influenced funding decisions in the previous year.

(b) Technical assistance

(1) Strategic planning

Not later than 90 days after December 16, 2016, the Attorney General shall begin to provide technical assistance to States and local governments requesting support to develop and implement the strategic plan required under

subsection (a)(6). The Attorney General may enter into agreements with 1 or more non-governmental organizations to provide technical assistance and training under this paragraph.

(2) Protection of constitutional rights

Not later than 90 days after December 16, 2016, the Attorney General shall begin to provide technical assistance to States and local governments, including any agent thereof with responsibility for administration of justice, requesting support to meet the obligations established by the Sixth Amendment to the Constitution of the United States, which shall include--

> (A) public dissemination of practices, structures, or models for the administration of justice consistent with the requirements of the Sixth Amendment; and

> (B) assistance with adopting and implementing a system for the administration of justice consistent with the requirements of the Sixth Amendment.

(3) Authorization of appropriations

For each of fiscal years 2017 through 2021, of the amounts appropriated to carry out this subpart, not less than $5,000,000 and not more than $10,000,000 shall be used to carry out this subsection.

## 34 U.S.C. § 10154

The Attorney General shall not finally disapprove any application (or any amendment to that application) submitted under this part without first affording the applicant reasonable notice of any deficiencies in the application and opportunity for correction and reconsideration.

**34 U.S.C. § 10155**

The Attorney General shall issue rules to carry out this part. The first such rules shall be issued not later than one year after the date on which amounts are first made available to carry out this part.

# 34 U.S.C. § 10156

(a) Allocation among States

    (1) In general

Of the total amount appropriated for this part, the Attorney General shall, except as provided in paragraph (2), allocate--

        (A) 50 percent of such remaining amount to each State in amounts that bear the same ratio of--

            (i) the total population of a State to--

            (ii) the total population of the United States; and

        (B) 50 percent of such remaining amount to each State in amounts that bear the same ratio of--

            (i) the average annual number of part 1 violent crimes of the Uniform Crime Reports of the Federal Bureau of Investigation reported by such State for the three most recent years reported by such State to--

            (ii) the average annual number of such crimes reported by all States for such years.

    (2) Minimum allocation

If carrying out paragraph (1) would result in any State receiving an allocation less than 0.25 percent of the total amount (in this paragraph referred to as a "minimum allocation State"), then paragraph (1), as so carried out, shall not apply, and the Attorney General shall instead--

        (A) allocate 0.25 percent of the total amount to each State; and

        (B) using the amount remaining after carrying out subparagraph (A), carry out paragraph (1) in a manner that excludes each minimum allocation State, including the population of and the crimes reported by such State.

(b) Allocation between States and units of local government

Of the amounts allocated under subsection (a) of this section--

    (1) 60 percent shall be for direct grants to States, to be allocated under subsection (c) of this section; and

    (2) 40 percent shall be for grants to be allocated under subsection (d) of this section.

(c) Allocation for State governments

    (1) In general

Of the amounts allocated under subsection (b)(1) of this section, each State may retain for the purposes described in section 3751 of this title an amount that bears the same ratio of--

        (A) total expenditures on criminal justice by the State government in the most recently completed fiscal year to--

        (B) the total expenditure on criminal justice by the State government and units of local government within the State in such year.

    (2) Remaining amounts

Except as provided in subsection (e)(1) of this section, any amounts remaining after the allocation required by paragraph (1) shall be made available to units of local government by the State for the purposes described in section 3751 of this title.

(d) Allocations to local governments

    (1) In general

Of the amounts allocated under subsection (b)(2) of this section, grants for the purposes described in section 3751 of this title shall be made directly to units of local government within each State in accordance with this subsection, subject to subsection (e) of this section.

    (2) Allocation

        (A) In general

From the amounts referred to in paragraph (1) with respect to a State (in this subsection referred to as the "local amount"), the Attorney General shall allocate to each unit of local government an amount which bears the same ratio to such share as the average annual number of part 1 violent crimes reported by such unit to the Federal Bureau of Investigation for the 3 most recent calendar years for which such data is available bears to the number of part 1 violent crimes reported by all units of local government in the State in which the unit is located to the Federal Bureau of Investigation for such years.

        (B) Transitional rule

Notwithstanding subparagraph (A), for fiscal years 2006, 2007, and 2008, the Attorney General shall allocate the local amount to units of local government in the same manner that, under the Local Government Law

Enforcement Block Grants program in effect immediately before January 5, 2006, the reserved amount was allocated among reporting and nonreporting units of local government.

(3) Annexed units

If a unit of local government in the State has been annexed since the date of the collection of the data used by the Attorney General in making allocations pursuant to this section, the Attorney General shall pay the amount that would have been allocated to such unit of local government to the unit of local government that annexed it.

(4) Resolution of disparate allocations

(A) Notwithstanding any other provision of this part, if--

(i) the Attorney General certifies that a unit of local government bears more than 50 percent of the costs of prosecution or incarceration that arise with respect to part 1 violent crimes reported by a specified geographically constituent unit of local government; and

(ii) but for this paragraph, the amount of funds allocated under this section to--

(I) any one such specified geographically constituent unit of local government exceeds 150 percent of the amount allocated to the unit of local government certified pursuant to clause (i); or

(II) more than one such specified geographically constituent unit of local government exceeds 400 percent of the amount allocated to the unit of local government certified pursuant to clause (i),

then in order to qualify for payment under this subsection, the unit of local government certified pursuant to clause (i), together with any such specified geographically constituent units of local government described in clause (ii), shall submit to the Attorney General a joint application for the aggregate of funds allocated to such units of local government. Such application shall specify the amount of such funds that are to be distributed to each of the units of local government and the purposes for which such funds are to be used. The units of local government involved may

establish a joint local advisory board for the purposes of carrying out this paragraph.

(B) In this paragraph, the term "geographically constituent unit of local government" means a unit of local government that has jurisdiction over areas located within the boundaries of an area over which a unit of local government certified pursuant to clause (i) has jurisdiction.

(e) Limitation on allocations to units of local government

(1) Maximum allocation

No unit of local government shall receive a total allocation under this section that exceeds such unit's total expenditures on criminal justice services for the most recently completed fiscal year for which data are available. Any amount in excess of such total expenditures shall be allocated proportionally among units of local government whose allocations under this section do not exceed their total expenditures on such services.

(2) Allocations under $10,000

If the allocation under this section to a unit of local government is less than $10,000 for any fiscal year, the direct grant to the State under subsection (c) of this section shall be increased by the amount of such allocation, to be distributed (for the purposes described in section 3751 of this title) among State police departments that provide criminal justice services to units of local government and units of local government whose allocation under this section is less than $10,000.

(3) Non-reporting units

No allocation under this section shall be made to a unit of local government that has not reported at least three years of data on part 1 violent crimes of the Uniform Crime Reports to the Federal Bureau of Investigation within the immediately preceding 10 years.

(f) Funds not used by the State

If the Attorney General determines, on the basis of information available during any grant period, that any allocation (or portion thereof) under this section to a State for such grant period will not be required, or that a State will be unable to qualify or receive funds under this part, or that a State chooses not to participate in the program established under this part, then such State's allocation (or portion thereof) shall be awarded by the Attorney General to units of local government, or combinations thereof, within such State, giving priority to those jurisdictions with the highest annual number of part 1 violent crimes of the Uniform Crime Reports reported by the unit

of local government to the Federal Bureau of Investigation for the three most recent calendar years for which such data are available.

(g) Special rules for Puerto Rico

    (1) All funds set aside for Commonwealth government

    Notwithstanding any other provision of this part, the amounts allocated under subsection (a) of this section to Puerto Rico, 100 percent shall be for direct grants to the Commonwealth government of Puerto Rico.

    (2) No local allocations

    Subsections (c) and (d) of this section shall not apply to Puerto Rico.

(h) Units of local government in Louisiana

In carrying out this section with respect to the State of Louisiana, the term "unit of local government" means a district attorney or a parish sheriff.

(i) Part 1 violent crimes to include human trafficking

For purposes of this section, the term "part 1 violent crimes" shall include severe forms of trafficking in persons (as defined in section 7102 of Title 22).

# 34 U.S.C. § 10157

(a) Of the total amount made available to carry out this part for a fiscal year, the Attorney General shall reserve not more than--

(1) $20,000,000, for use by the National Institute of Justice in assisting units of local government to identify, select, develop, modernize, and purchase new technologies for use by law enforcement, of which $1,000,000 shall be for use by the Bureau of Justice Statistics to collect data necessary for carrying out this part; and

(2) $20,000,000, to be granted by the Attorney General to States and units of local government to develop and implement antiterrorism training programs.

(b) Of the total amount made available to carry out this part for a fiscal year, the Attorney General may reserve not more than 5 percent, to be granted to 1 or more States or units of local government, for 1 or more of the purposes specified in section 3751 of this title, pursuant to his determination that the same is necessary--

(1) to combat, address, or otherwise respond to precipitous or extraordinary increases in crime, or in a type or types of crime; or

(2) to prevent, compensate for, or mitigate significant programmatic harm resulting from operation of the formula established under section 3755 of this title.

(a) Trust fund required

A State or unit of local government shall establish a trust fund in which to deposit amounts received under this part.

(b) Expenditures

    (1) In general

    Each amount received under this part (including interest on such amount) shall be expended before the date on which the grant period expires.

    (2) Repayment

    A State or unit of local government that fails to expend an entire amount (including interest on such amount) as required by paragraph (1) shall repay the unexpended portion to the Attorney General not later than 3 months after the date on which the grant period expires.

    (3) Reduction of future amounts

    If a State or unit of local government fails to comply with paragraphs (1) and (2), the Attorney General shall reduce amounts to be provided to that State or unit of local government accordingly.

(c) Repaid amounts

Amounts received as repayments under this section shall be subject to section 3712g of this title as if such amounts had not been granted and repaid. Such amounts shall be deposited in the Treasury in a dedicated fund for use by the Attorney General to carry out this part. Such funds are hereby made available to carry out this part.

# 34 U.S.C. § 10102

(a) Specific, general and delegated powers

The Assistant Attorney General shall--

> (1) publish and disseminate information on the conditions and progress of the criminal justice systems;

> (2) maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice;

> (3) provide information to the President, the Congress, the judiciary, State and local governments, and the general public relating to criminal justice;

> (4) maintain liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice;

> (5) coordinate and provide staff support to coordinate the activities of the Office and the Bureau of Justice Assistance, the National Institute of Justice, the Bureau of Justice Statistics, the Office for Victims of Crime, and the Office of Juvenile Justice and Delinquency Prevention; and

> (6) exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants.

(b) Annual report to President and Congress

The Assistant Attorney General shall submit an annual report to the President and to the Congress not later than March 31 of each year.

**CERTIFICATE OF SERVICE**

I certify that on December 28, 2017, I electronically filed the attached Brief of

Plaintiff-Appellee with the Clerk of the Court for the United States Court of Appeals

for the Seventh Circuit by using the CM/ECF system. I certify that service on all

CM/ECF registered users will be accomplished by the CM/ECF system.


_____/s/Benna Ruth Solomon_____
BENNA RUTH SOLOMON
Deputy Corporation Counsel
City of Chicago
30 N. LaSalle Street, Suite 800
Chicago, IL 60602
(312) 744-7764

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and Cir. R. 32(c).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 13,327 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Garamond font.  As permitted by Fed. R. App. P. 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

      /s/Benna Ruth Solomon    
BENNA RUTH SOLOMON
Deputy Corporation Counsel
City of Chicago
30 N. LaSalle Street, Suite 800
Chicago, IL 60602
(312) 744-7764

December 28, 2017